**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE THIRD CIRCUIT**

No. 25-3250

**DELAWARE STATE SPORTSMEN'S ASSOCIATION, INC., ET AL.,**

Appellants-Plaintiffs,

v.

**DELAWARE DEPARTMENT OF SAFETY AND HOMELAND SECURITY, ET AL.**

Appellees-Defendants.

_____

United States District Court for the U.S. District Court of Delaware

Appeal from a Judgment of the United States District Court
for the District of Delaware (Noreika, J.)
(Dist. Ct. No. 1:25-cv-01341-MN)

_____

**OPENING BRIEF OF APPELLANTS**

Francis G.X. Pileggi, Esquire
LEWIS BRISBOIS
  BISGAARD & SMITH LLP
500 Delaware Avenue, Suite 700
Wilmington, DE 19801
(302) 985-6000

OF COUNSEL:                          Francis.Pileggi@LewisBrisbois.com
Joseph G.S. Greenlee, Esquire
National Rifle Association of        Alexander MacMullan, Esquire
America–Institute for Legislative    565 E. Swedesford Road, Suite 303
   Action                            Wayne, PA 19087
11250 Waples Mill Road               Alexander.MacMullan@LewisBrisbois.com
Fairfax, VA  22030

Dated:  March 25, 2026

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit LAR 26.1, Bridgeville Kenpo Karate, Inc. d/b/a BKK Firearms ("BKK"), Delaware State Sportsmen's Association, Inc. ("DSSA"), and Bridgeville Rifle & Pistol Club, Ltd. ("BRPC") hereby disclose as follows:

BKK has no parent corporation. No publicly held corporation or affiliate owns 10% or more of its stock.

DSSA has no parent corporation, but is the Delaware affiliate of the National Rifle Association. No publicly held corporation or affiliate owns 10% or more of its stock.

BRPC has no parent corporation. No publicly held corporation or affiliate owns 10% or more of its stock.

Dated:  March 25, 2026

Respectfully submitted,

*/s/ Francis G.X. Pileggi*
Francis G.X. Pileggi, Esquire

173922229.1

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT .........................................................i

TABLE OF AUTHORITIES ............................................................................v

JURISDICTIONAL STATEMENT ...................................................................1

ISSUES PRESENTED.....................................................................................2

STATEMENT OF RELATED CASES ..............................................................4

STATEMENT OF THE CASE...........................................................................5

I.     Statutory Background ...........................................................................5

II.    Implementation of the Permit Requirement ........................................6

III.   Appellants/Challengers.........................................................................7

IV.    *Neuberger I*—The Earlier Filed District Court Action...................8

V.     Proceedings in the District Court.........................................................9

VI.    Proceedings in the Court of Appeals for the Third Circuit.............10

SUMMARY OF ARGUMENT.....................................................................11

ARGUMENT ...............................................................................................13

I.     The Permit Bill Violates the Second Amendment...........................13

    A.   Standard of Review .....................................................................13

    B.   This Court May Resolve the Constitutionality of the Permit Bill in This Interlocutory Appeal.................................................................13

    C.   The Permit Bill is Invalid Under the Second Amendment .................17

173922229.1

1. The Permit Bill Is Unconstitutional On Its Face ......................17

2. The Second Amendment's plain text covers the right to keep—and thus acquire—arms ................................................20

3. The Permit Bill is not Presumptively Lawful ..........................25

4. The State Cannot Meet its Burden to Prove that the Permit Bill is Part of the Historical Tradition of Firearm Regulation..31

    i. The State must present "relevantly similar" analogues for the Permit Bill from the Founding Era ....................31

    ii. The State cannot present "relevantly similar" historical analogues from the time of the founding that justify the Permit Bill..................................................................32

    iii. The Permit Bill's Training and Live-Fire Requirements are also Unconstitutional Because Historically Americans Never Had to Train to Possess Arms ...........35

II. The District Court Erred in Dismissing Parties Under the Claim-Splitting Doctrine ................................................................38

    A. Standard of Review ........................................................................38

    B. Mertis of the Argument ................................................................39

      1. Challengers Did Not Engage in Impermissible Claim Splitting.............................................................................39

      2. The Court Erred Dismissing Certain Challengers ....................42

III. The District Court Erred in Denying Preliminary Injunctive Relief.............45

    A. Standard of Review ........................................................................45

    B. Challengers Demonstrated a Likelihood of Success on the Merits..................................................................................45

1. The Challengers Are Likely to Succeed Showing the Permit Bill is Unconstitutional......................................................45

2. The State Violates the APA ......................................................47

3. The District Court Erred in Concluding the Infrastructure Was Sufficient ............................................................................51

C. Challengers Demonstrated the Other Elements Warranting Preliminary Injunctive Relief ...........................................................53

1. Challengers Demonstrated Irreparable Harm ...........................53

2. The Balance of Equities and Public Interest Favor Relief........57

CONCLUSION ...............................................................................................59

CERTIFICATE OF BAR MEMBERSHIP ...............................................................61

CERTIFICATE OF COMPLIANCE .......................................................................62

CERTIFICATE OF SERVICE ...............................................................................63

CERTIFICATE OF ELECTRONIC FILING .............................................................64

# TABLE OF AUTHORITIES

**CASES**                                                                                    **Page**

*ACLU v. Ashcroft*,
    322 F.3d 240 (3d Cir. 2003) ...................................................................57

*Aldridge v. Commonwealth*,
    4 Va. 447 (1824) ...................................................................34

*Andrews v. State*,
    50 Tenn. 165 (1871)...................................................................24

*Baker v. Delaware Dep't of Nat. Res. & Env't Control*,
    No. CV S13C-08–026, 2015 WL 5971784
    (Del. Super. Ct. Oct. 7, 2015) ...................................................49

*Chase Manhattan Bank, N.A. v. Am. Nat. Bank & Tr. Co. of Chicago*,
    93 F.3d 1064 (2d Cir. 1996) ...................................................16

*Club Madonna, Inc. v. City of Miami Beach*,
    924 F.3d 1370 (11th Cir. 2019)...................................................17

*Curtis v. Citibank, N.A.*,
    226 F.3d 133 (2d Cir. 2000) ...............................................39, 40

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*,
    108 F.4th 194 (3d Cir. 2024)...................................................53

*Delaware State Sportsmen's Ass'n v. Garvin*, No. CV K19C-11-001 NEP,
    2020 WL 6813997 (Del. Super. Ct. Nov. 18, 2020) ...............................41, 47,48

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)...................................................................*passim*

*Gavin J. Birney, et al. v. Del. Dept. of Homeland Security, et al.*
    C.A. No. K23C-07-019 RLG (Del. Super., Oct. 2, 2025) ...............................19

*Gazzola v. Hochul*,
    88 F.4th 186 (2d Cir. 2023) ...................................................21

*Gen. Land Off. v. Biden*,
   71 F.4th 264 (5th Cir. 2023)...................................................................39

*In re Hill*,
   775 F.2d 1385 (9th Cir. 1985)...............................................................43

*Jones v. Caruso*,
   569 F.3d 258 (6th Cir. 2009)..................................................................15

*K.A. v. Pocono Mountain Sch. Dist.*,
   710 F.3d 99 (3d Cir. 2013)....................................................................58

*Koons v. Attorney General of New Jersey*,
   156 F.4th 210 (3d Cir. 2025)................................................................56

*Kos Pharms., Inc. v. Andrx Corp.*,
   369 F.3d 700 (3d Cir. 2004) .................................................................45

*Lara v. Comm'r Pa. State Police*,
   125 F.4th 428 (3d Cir. 2025)....................................................13, 19, 31

*Leonard v. Stemtech Int'l, Inc.*,
   C.A. No. 12-86-LPS-CJB, 2012 WL 3655512
   (D. Del. Aug. 24, 2012) .......................................................................41

*Luis v. United States*,
   578 U.S. 5 (2016)..................................................................................24

*Maldonado v. Houstoun*,
   157 F.3d 179 (3d Cir. 1998).............................................................14, 53

*M'Culloch v. Maryland*,
   17 U.S. 316 (1819)................................................................................23

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010)..............................................................................24

*McKenna v. City of Phila.*,
   304 F. App'x 89 (3d Cir. 2008).......................................................38, 42, 43

173922229.1

*Minneapolis Star & Trib. Co. v. Minnesota Comm'r of Revenue*,
460 U.S. 575 (1983)..................................................................................24

*Myrie v. Att'y Gen. United States*,
855 F.3d 509 (3d Cir. 2017)......................................................................13

*Nat'l Rifle Ass'n v. Bondi*,
133 F.4th 1108 (11th Cir. 2025) ...............................................................22

*Neuberger v. Delaware Department of Safety and Homeland Security*,
C.A. No. 24-590-MN (D. Del.) ..........................................................*passim*

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1, 24 (2022)........................................................................*passim*

*New York State Rifle & Pistol Ass'n, Inc. v. City of New York*,
590 U.S. 336 (2020)............................................................................23, 25

*Nguyen v. Bonta*,
140 F.4th 1237 (9th Cir. 2025) .................................................................22

*Oakland Tactical Supply, LLC v. Howell Twp., Michigan*,
103 F.4th 1186, 1192 (6th Cir),
*cert. denied,* 145 S. Ct. 603 (2024)...........................................................23

*OFC Comm Baseball v. Markell*,
579 F.3d 293 (3d Cir. 2009) .....................................................................12

*Ortega v. Grisham*,
148 F.4th 1134 (10th Cir. 2025) ..........................................................22, 24

*Ortiz v. Eichler*,
794 F.2d 889 (3d Cir. 1986) .....................................................................15

*Pena-Rodriguez v. Colorado*,
580 U.S. 206 (2017)..................................................................................33

*Range v. Att'y Gen. United States*,
124 F.4th 218 (3d Cir. 2024).....................................................................27

*Reese v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  127 F.4th 583 (5th Cir. 2025) ..............................................................21, 22

*Ramos v. Louisiana*,
  590 U.S. 83 (2020)..............................................................................33

*Ramsay v. Nat'l Bd. of Med. Exam'rs*,
  968 F.3d 251 (3d Cir. 2020) ...............................................................45

*Richmond Newspapers, Inc. v. Virginia*,
  448 U.S. 555 (1980)............................................................................23

*S.E.C. v. Black*,
  163 F.3d 188 (3d Cir. 1998) ...............................................................15

*S.E.C. v. First Jersey Sec., Inc.*,
  101 F.3d 1450 (2d Cir. 1996) .............................................................42

*Schneider v. United States*,
  301 F. App'x 187 (3d Cir. 2008)........................................................39

*Smith v. City of Atl. City*,
  138 F.4th 759 (3d Cir. 2025)..............................................................45

*Solantic, LLC v. City of Neptune Beach*,
  410 F.3d 1250 (11th Cir. 2005)..........................................................15

*Trireme Energy Dev., LLC v. RWE Renewables Americas, LLC*,
  No. 22-CV-07439 (JLR), 2023 WL 5469662
  (S.D.N.Y. Aug. 24, 2023)...................................................................42

*United States v. Rahimi*,
  602 U.S. 680 (2024)..............................................................29, 30, 33

*Walton v. Eaton Corp.*,
  563 F.2d 66 (3d Cir. 1977).................................................................38

**STATUTES**

11 *Del. C.* §1448D ...........................................................................*passim*

28 U.S.C. § 1292(a)(1)..................................................................1, 14

28 U.S.C. § 1331 ...................................................................................1

42 U.S.C. § 1983 ...................................................................................9

**OTHER AUTHORITIES**

1 *A Collection of All Such Acts of the General Assembly of Virginia, of a Public & Permanent Nature, as are Now in Force* (2d ed. 1814) https://www.google.com/books/edition/A_Collection_of_All_Such_Acts_of_the_ Gen/Mz4wAQAAMAAJ?hl=en&gbpv=1&bsq=%22powder%22 ........................34

1 *America's Founding Charters: Primary Documents of Colonial and Revolutionary Era Governance* (Jon Wakelyn ed., 2006) (Concessions and Agreements, Jan. 11, 1664) ......................................................37

2 *A Digest of the Statute Law of Kentucky* (William Littell & Jacob Swigert eds., 1822) https://www.google.com/books/edition/A_Digest_of_the_Statute_Law_of_Kentuc ky/0zhFAAAAYAAJ?hl=en&gbpv=1&bsq=%22one%20gun%22. .......................34

David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U.L.J. 495 (2019) ..........................................................36

George H. Ryden, *Delaware-The First State in the Union* (1938)..........................36

1 William Waller Hening, *The Statutes at Large* (1619-1660) ..............................37

*Merriam-Webster's Collegiate Dictionary* (10th ed. 1996) ....................................21

8 *Laws of the State of Delaware*, From the Sixteenth Day of January, One Thousand Eight Hundred and Thirty, to the Thirteenth Day of February, One Thousand Eight Hundred and Thirty-Five 208 (1841) https://www.google.com/books/edition/Laws_of_the_State_of_Delaware/gkFKAA AAYAAJ?hl=en&gbpv=1&bsq=%22license%22 .............................................33, 34

1 Noah Webster, *American Dictionary of the English Language* (1828) ...............21

*Proceedings and Acts of the General Assembly of Maryland January 1637/8 September 1664* (William Hand Browne ed. 1883)...................................................37

*The American Heritage College Dictionary* (3d ed. 1993) ....................................21

*The Federalist* No. 44 (James Madison).................................................................23

1 Samuel Johnson, *Dictionary of the English Language* (4th ed. 1773).................21

16 *Wright & Miller's Federal Practice & Procedure* (3d ed. 2025) .......................14

18 *Wright & Miller's Federal Practice & Procedure* (3d ed. 2025) .......................39

What Is Constitutional Carry? | State Gun Laws | USCCA Blog) https://www.usconcealedcarry.com/blog/constitutional-carry-in-states/.................28

173922229.1

# JURISDICTIONAL STATEMENT

This appeal arises under the Constitution and laws of the United States, including the Second Amendment. The District Court therefore had subject matter jurisdiction under 28 U.S.C. § 1331.

On November 14, 2025, the District Court entered an order denying Appellants' motion for expedited injunctive relief. That order is appealable under 28 U.S.C. § 1292(a)(1), which grants courts of appeals jurisdiction over interlocutory orders refusing injunctions.

Appellants, referred to in this appeal as the Challengers, timely filed a notice of appeal that same day. This Court therefore has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

In addition and as set forth in Section I.B. below, although this appeal arises from the denial of expedited injunctive relief, this Court may exercise plenary review and resolve the principal issue in this case—whether Delaware's "permit-to-purchase" handgun statute, Senate Substitute 1 for Senate Bill 2 (the "Permit Bill"), violates the Second Amendment under *Bruen.*

# ISSUES PRESENTED

I.      Whether the Permit Bill violates the Second Amendment by requiring law-abiding citizens to obtain a government permit before acquiring a handgun—the quintessential self-defense weapon—absent any showing that such a requirement is consistent with the Nation's historical tradition of firearm regulation under *New York State Rifle & Pistol Association v. Bruen.* App067-098 (Complaint); App228-229 (Oral Order); App251-254 (Opposition Brief); App282-284 (Reply Brief); App352-355 (Post-Oral Argument Letter); App415-416 (Oral Argument Transcript).

II.     Whether the District Court erred in dismissing parties under the claim-splitting doctrine where this action is based on new, previously unavailable, and unforeseeable material facts and claims arising after the earlier-filed complaint—and further abused its discretion by dismissing rather than consolidating the actions. App023-025 (Memorandum Opinion); App055-077 (Complaint); App170-180 (Opening Brief); App280-282 (Reply Brief); App381-382 (Letter Enclosing Complaint); App387-394 (Oral Argument Transcript).

III.    Whether the District Court erred in denying emergency injunctive relief based solely on its assessment of likelihood of success, where Challengers satisfied all preliminary injunction factors, and where enforcement of the Permit Bill—before implementation of regulations that comply with Delaware's Administrative

173922229.1

Procedures Act ("APA")—infringes on the rights of law-abiding citizens to acquire handguns for lawful purposes, including self-defense in the home. App025-028 (Memorandum Opinion); App055-077 (Complaint); App170-181 (Opening Brief); App280-285 (Reply Brief).

## STATEMENT OF RELATED CASES

The Challengers are aware of no other pending cases or proceeding before this Court challenging the constitutionality of the Permit Bill.

Certain of the Challengers in this appeal brought an earlier filed lawsuit in the United States District Court for the District of Delaware challenging the Permit Bill the day it became law. *Neuberger v. Delaware Department of Safety and Homeland Security*, C.A. No. 24-590-MN (D. Del.) ("*Neuberger I*"). As discussed below, that lawsuit is currently pending, but due to materially new facts and allegations, as well as exigent circumstances, this matter was subsequently filed.

**STATEMENT OF THE CASE**

This is an interlocutory appeal from an order by the United States District Court for the District Delaware denying Challengers' motion for emergency injunctive relief and dismissing certain Challengers on claim-splitting grounds. Challengers seek reversal of that order and a preliminary injunction preventing continued enforcement of the Permit Bill, which Challengers contend is unconstitutional. Challengers also seek a declaration from this Court that the Permit Bill is unconstitutional under the Second Amendment as well as a permanent injunction preventing its enforcement.

## I.     Statutory Background

On May 16, 2024, Delaware enacted the Permit Bill, which establishes a permit requirement as a prerequisite to purchasing a handgun. Under the Permit Bill, an individual may not purchase a handgun without first obtaining a "handgun qualified purchaser permit" issued by the Director of the State Bureau of Identification ("SBI"). App070-071 ¶¶ 54-59 (Complaint); App117 (Exhibit to Complaint).

To obtain such a permit, an applicant must submit an application containing personal identifying information, undergo fingerprinting, undergo both state and federal background checks, as well as complete a certified firearms training course. App072 ¶¶62-63 (Complaint); App115-116 (Exhibit to Complaint). The required

training course includes multiple instructional components and live-fire training involving at least one-hundred rounds of ammunition. *Id.* The Permit Bill also imposes criminal liability on firearms dealers who transfer a handgun to a purchaser without complying with the Permit Bill. App062 ¶35 (Complaint); App120 (Exhibit to Complaint).

By its terms, the Permit Bill became enforceable on the sooner of either: (i) the State establishing the infrastructure necessary for implementation, or (ii) eighteen months after its enactment. App121 (Exhibit to Complaint).

## II. Implementation of the Permit Requirement

Although the statute provided an eighteen-month implementation period, the State failed to implement a fully functioning permitting system that was APA compliant by the Permit Bill's November 16, 2025 enforcement date. App135-144 (Exhibit to Complaint). For example, the State's permit website initially contained inactive application links and incomplete regulatory guidance regarding the permitting process. App 347 ¶12, App350-351 (Decl. in Support of Reply Brief). Further, the State's firearm transaction approval system had been delayed because of "critical errors" requiring additional testing before the system could be released. App146 (Exhibit to Complaint). The approval of training instructors was also delayed and training classes were virtually non-existent. App173-174 (Opening Brief); App281-282 (Reply Brief); App300-301 ¶¶7-9 (Decl. in Support of Reply

Brief). Finally, the legislature left several rules in the Permit Bill to be promulgated by the designated agency. App119 (Exhibit to Complaint). However, the rules that were promulgated were not done so under the APA. App176-178 (Opening Brief); App280-281 (Reply Brief). As a result of the foregoing, individuals wishing to purchase handguns were not able to obtain the required permits by the enforcement date. App057-059, 064 ¶¶12, 18, 26, 42 (Complaint).

### III.    Appellants/Challengers

Certain of the Challengers are Delaware residents and organizations whose members wish to purchase handguns for lawful purposes including self-defense and competitive shooting. Challenger Thomas Neuberger ("Neuberger") is a Delaware attorney who intends to purchase a handgun for self-defense but stated he would be unable to do so once the permit requirement takes effect. App.057 ¶12 (Complaint). Challenger Jerry Martin ("Martin") is a competitive shooter who alleged that the permitting scheme prevents him from purchasing a handgun he intends to acquire. App058 ¶18. Challenger William Hague, Jr. ("Hague") likewise intends to purchase a handgun but is unable to do so because of the permit requirement.  App59 ¶26 (Complaint).

Challenger Bridgeville Kenpo Karate, Inc., doing business as BKK Firearms ("BKK"), is a federally licensed firearms dealer that alleges the permit requirement prevents it from selling handguns to customers and exposes it to criminal liability

under the Permit Bill. App061-062 ¶¶34-37 (Complaint). Challenger Bruce Smith ("Smith") is the owner of BKK. App060 ¶30 (Complaint). Challengers also include the Delaware State Sportsmen's Association ("DSSA") and the Bridgeville Rifle and Pistol Club ("BRPC"), organizations whose members, which include Smith, Neuberger, Hague, and Martin, make up both handgun sellers and purchasers that are subject to the permit requirement. App063-065 ¶¶40-44 (Complaint).

## IV.   *Neuberger I*—The Earlier Filed District Court Action

On May 16, 2024, the same day Permit Bill was enacted and prior to the filing of this action, certain Challengers filed a separate lawsuit challenging the constitutionality of the Permit Bill. Several of the Challengers in this case—Neuberger, Martin, Hague, DSSA, and the BRPC—were also parties in *Neuberger I*. But as to DSSA and BRPC, only the members of those organizations that were purchasers were alleged to have been injured (as opposed to the instant matter where the injured members include both purchasers and sellers).

The State filed a motion to dismiss the Second Amended Complaint in that action on March 7, 2025, alleging, *inter alia*, failure to state a claim for infringement under the Second Amendment. That motion has been fully briefed and remains pending as of the filing of this appeal.

## V. Proceedings in the District Court

On November 3, 2025, based on material new developments and the urgency of the Permit Bill's implementation date of November 16, 2025, Challengers filed the Complaint in this action. The Complaint asserts claims under the Second Amendment, the Fourth Amendment, and the Fourteenth Amendment, and seeks declaratory and injunctive relief pursuant to 42 U.S.C. § 1983. App051-156 (Complaint).

Because, by its terms, the Permit Bill had to be implemented shortly after this instant case was filed, Challengers simultaneously filed a motion seeking emergency injunctive relief requesting that enforcement of the Permit Bill be enjoined because the State had not established a functioning, APA-compliant, permit process as described, thereby preventing law-abiding citizens from purchasing handguns.

The District Court ordered expedited briefing on Challengers' request for emergency injunctive relief. At the District Court's request, the briefing included argument on whether the Permit Bill is constitutional under *Bruen*. App228 (November 5, 2025 Oral Order). The District Court conducted a hearing on Challengers' motion for emergency injunctive relief on November 13, 2025. App037 (Docket).

On November 14, 2025, after receiving new evidence from the State—after the hearing—that Challengers were not given an opportunity to respond to, the

District Court issued a written decision denying Challengers' motion for emergency injunctive relief based on the incorrect conclusion that the Challengers had not satisfied the "likelihood of success on the merits" element for expedited injunctive relief. *See* App025-027 (Memorandum Opinion). The District Court also unreasonably dismissed certain Challengers based on claim-splitting concerns arising from the *Neuberger I* lawsuit. App023-025 (Memorandum Opinion).

Challengers filed a timely expedited notice of appeal on the same date as the District Court's denial of emergency injunctive relief. App001-002 (Notice of Appeal).

## VI. Proceedings in the Court of Appeals for the Third Circuit

Following the filing of their notice of appeal, Challengers filed an emergency motion in this Court seeking expedited injunctive relief pending appeal. On December 1, 2025, this Court denied Challengers' motion for expedited injunctive relief pending appeal--but also directed "[t]he Clerk of Court [to] issue a briefing schedule for merits briefs in the ordinary course." D.I. 21.

On January 14, 2026, this Court issued a briefing and scheduling order directing that Appellants' opening brief and joint appendix be filed on or before February 23, 2026, with responsive briefing to follow pursuant to the Federal Rules of Appellate Procedure and this Court's local rules. D.I. 23. The deadline of February 23, 2026, was extended by approval of this Court to March 25, 2026. D.I. 26.

## SUMMARY OF THE ARGUMENT

This Court ordered merits briefing in this appeal, consistent with its precedent, to address the substantive issues from the denial of injunctive relief.

The core substantive issue is that the statute being challenged unlawfully requires a discretionary permit from the State before a handgun can be purchased, even for the home—but the permit may only be granted after one traverses an obstacle course of onerous requirements in the Permit Bill. Controlling decisions of both the United States Supreme Court and this Court teach that such an infringement of the rights recognized by the Second Amendment to the United States Constitution will not pass muster where, as here, they are not consistent with this Nation's tradition of firearm regulation during the founding era. This case can be decided on that basis without reaching other issues in this appeal.

The District Court also abused its discretion by punitively dismissing an earlier case filed by some of the same Challengers in this case, the facts of which had become obsolete while dispositive motions were pending. The earlier action was based on facts and arguments that had become moot during the passage of time while the trial court was considering dispositive motions. Instead, the District Court should have consolidated the earlier case with the instant matter, but further erred as a matter of law in finding that some Challengers engaged in improper claim splitting.

Although the Challengers demonstrate that they have satisfied the standard for the grant of injunctive relief, this Court can decide the foregoing substantive issues, as it has in prior cases, *see, e.g., OFC Comm Baseball v. Markell*, 579 F.3d 293, 300 (3d Cir. 2009), about which there is no material factual dispute--without deciding the issue of injunctive relief--by ruling on the merits due to the violations of the Second Amendment. If this Court reaches the issue of injunctive relief, Challengers have satisfied all the preliminary injunction factors. Enforcement of the Permit Bill—before implementation of regulations that comply with Delaware's Administrative Procedures Act ("APA")—would rely on unlawful regulations that infringe on the rights of law-abiding citizens to acquire handguns for lawful purposes, including for self-defense in the home.

**ARGUMENT**

**I.      The Permit Bill Violates the Second Amendment**

**A.      Standard of Review**

The claim that the Permit Bill violates the Second Amendment raises constitutional claims based on the statutory text and thus presents a pure question of law. *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 433 n.7 (3d Cir. 2025). Where a constitutional challenge turns on statutory text rather than disputed adjudicative facts, appellate review is entirely *de novo*. *Myrie v. Att'y Gen. United States*, 855 F.3d 509, 515 (3d Cir. 2017).

In Second Amendment challenges, courts apply the two-step text-and-history framework articulated in *Bruen*. A court first asks whether the Second Amendment's plain text covers the conduct at issue. If it does, that conduct is presumptively protected, and the regulation may be upheld only if the government demonstrates in the second step that the regulation is consistent with the Nation's historical tradition of firearm regulation. *Lara*, 125 F.4th at 434 (citing *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022)).

**B.      This Court May Resolve the Constitutionality of the Permit Bill in This Appeal**

Although this appeal arises from the denial of a preliminary injunction, this Court directed briefing on the merits and has authority to resolve the constitutional question presented. D.I. 21. Appeals from interlocutory orders granting or denying

173922229.1

13

injunctions under 28 U.S.C. §1292(a)(1) are not rigidly confined to the injunction determination itself.

Appellate review may extend to issues that are "inextricably bound up" with the injunction decision or whose resolution is necessary to determine whether injunctive relief should have been granted. *See* 16 *Wright & Miller's Federal Practice & Procedure* § 3921.1 (3d ed. 2025) (explaining that appellate review in injunction appeals may extend to issues closely intertwined with the injunction decision). For that reason, courts of appeals frequently resolve underlying legal questions where, as here, a preliminary injunction appeal presents purely legal issues. *Markell*, 579 F.3d at 300.

This Court has recognized that although a panel reviewing a preliminary injunction ordinarily determines only whether the district court abused its discretion, it is not required to take such a narrow approach where the appeal presents a question of law, and—as in this case—the factual record is sufficiently developed. *See id.* at 298-300 (recognizing the Court's "authority to address all aspects of" of the case on interlocutory appeal and reaching and deciding the merits); *Maldonado v. Houstoun*, 157 F.3d 179, 190-91 (3d Cir. 1998) (on appeal from a preliminary injunction affirming grant of a preliminary injunction and exercising plenary review and resolving the purely legal question of constitutionality finding the relevant state statute unconstitutional).

Further, this Court may address additional legal issues that are inextricably intertwined with the injunction order on appeal from preliminary injunctions. *See Ortiz v. Eichler*, 794 F.2d 889, 892 (3d Cir. 1986) (finding that "[t]he additional declaratory relief . . . tracks issues virtually identical to those raised by the grant of injunctive relief." and noting that "[w]here the additional elements of the district court's order are closely intertwined with those granting or denying injunctive relief, the exercise of jurisdiction over the additional elements is proper."); *S.E.C. v. Black*, 163 F.3d 188, 194 (3d Cir. 1998) (noting that on appeal from an order modifying a preliminary injunction, it was proper to consider challenges to the procedural rights in connection with the hearing which led to the modification).

Other courts of appeals have taken the same approach. *See, e.g., Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1272-74 (11th Cir. 2005) (reaching and resolving the merits of a constitutional challenge on appeal from denial of a preliminary injunction because the issues were purely legal); *Jones v. Caruso*, 569 F.3d 258, 269-70 (6th Cir. 2009) (holding that appellate courts reviewing preliminary injunction orders may address the merits where legal issues are intertwined with the injunction determination).

This case presents precisely those circumstances. The constitutionality of Delaware's Permit Bill presents a purely legal question controlled by the standards established in *New York State Rifle & Pistol Association v. Bruen,* and the relevant

facts concerning the statutory scheme are of record. Indeed, the Parties briefed the issue pursuant to a specific directive by the District Court. App228-229. Accordingly, the District Court proceedings and Complaint contain a sufficient record to address the issue in this appeal. *Markell*, 579 F.3d at 298-300.

Resolving the constitutional issue now will also promote judicial economy. Because the constitutionality of the Permit Bill is the dispositive legal issue in this case, resolution would resolve all the other issues in this appeal. Postponing resolution until after further proceedings below would also unnecessarily delay inevitable appellate review, while requiring the parties and the trial court to expend additional resources. Where, as here, the record is sufficient and the legal issue is fully presented, appellate courts routinely resolve the merits in order to avoid unnecessary further litigation. *Chase Manhattan Bank, N.A. v. Am. Nat. Bank & Tr. Co. of Chicago*, 93 F.3d 1064, 1071–72 (2d Cir. 1996) (deciding a summary judgment on appeal even though the district court didn't rule on it and noting that remand is not necessary where "the record adequately support the proper result").

This case is also particularly well suited for resolution on interlocutory appeal because the Challengers present a facial constitutional challenge to a statute. The operative facts are therefore the terms of the statutory scheme itself. Courts recognize that facial constitutional challenges presenting purely legal issues are appropriate for appellate resolution where the record is sufficiently complete and no

further factual development would aid the analysis. *Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1380 (11th Cir. 2019). Because Plaintiffs' Second Amendment claim turns on the legal question whether Delaware's Permit Bill is consistent with the Nation's historical tradition of firearm regulation under *Bruen*, additional proceedings in the district court would not materially affect the constitutional analysis.

Finally, this Court's own scheduling order directing full merits briefing confirms that the issues presented are appropriate for comprehensive appellate review in this interlocutory appeal. D.I. 21. This Court's decision to set a merits briefing schedule reflects that this appeal presents legal questions capable of resolution on the existing record

### C. The Permit Bill is Invalid Under the Second Amendment

### 1. The Permit Bill Is Unconstitutional On Its Face

The State of Delaware's Permit Bill[1] flouts Delawareans' fundamental civil rights by imposing an ahistorical and onerous permitting scheme, as a prerequisite for acquisition of a handgun for self-defense and other lawful purposes. The Permit Bill mandates that all Delawareans, excluding those who hold a valid license to carry weapons, submit an application for a handgun license *before* purchasing and

---

[1] The Permit Bill is codified at 11 *Del. C.* § 1448D

possessing a handgun.[2] *See* 11 *Del. C.* §§1448D (b)(2) and (c)(2). It requires a Delaware citizen to obtain a handgun qualified purchasing permit prior to purchasing a handgun—but not other firearms. *See* § 1448D.[3]

To apply for and be eligible for a permit, an applicant must provide the State with personal information—their race, ethnicity, national origin, and a physical description, including any distinguishing characteristics. § 1448D(d)(1). An applicant must attend a certified "firearms training course" with 11 different parts and must fire at least 100 rounds of ammunition. § 1448D(f)(4)a-k. The application and its requisite parts are all at the applicant's expense. Applicants must also be at

---

[2] The Permit Bill suffers from a textual contradiction with respect to those persons that hold a valid license to carry a concealed deadly weapon ("CCDW"). While the Permit Bill exempts a CCDW holder from the requirement to obtain a permit-to-purchase, another portion of the statute imposes a prerequisite to the sale of a handgun that the seller require a permit-to-purchase from a CCDW holder. Specifically, 11 *Del. C.* §1448D(c)(2) provides that "[a] person who holds a valid license to carry concealed deadly weapon . . . is not required to apply for a handgun qualified purchaser permit under this section before purchasing a handgun." However, 11 *Del. C.* § 1448A(a)(2) states "[a] transferor may not sell . . . a handgun to any other person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, unless the buyer or transferee has a valid handgun qualified purchaser permit issued by the [SBI] under §1448D of this title." Because the Permit Bill imposes criminal liability on sellers for non-compliance, this textual contradiction causes irreparable injury to firearm sellers since they do not know what actions will subject them to criminal liability.

[3] It defines a "handgun" to include "a pistol, revolver, or other firearm designed to be readily capable of being fired when held in 1 hand." § 1448D(a)(2).

173922229.1

least 21 years of age, unconstitutionally barring adults between the ages of 18 and 20 from purchasing a handgun.[4] § 1448D(f)(1).

All applications require the discretionary approval of an unelected state employee, the Director of the State Bureau of Identification ("the Director"), giving the state government discretion over approval, denial and revocation of permits. §1448D(h)(i).

Specifically, the Director at his or her sole discretion, is empowered to deny a permit to any person based on the amorphous and undefined standard of one who "poses a danger of causing physical injury to self or others by owning, purchasing or possessing firearms," and may revoke a permit "at any time" pursuant to the same criteria. §§ 1448D (f)(3); (*l*)(1).

What constitutes a "danger" is not articulated in the Permit Bill. If the Director, in his sole discretion, does revoke a license, the State Police have purported

---

[4] This ban on adults between the ages of 18 to 20 is also unconstitutional. This Court held in *Lara v. Comm'r Pa. State Police,* 125 F.4th 428 (3d Cir. 2025), that 18 to 20 year-olds are among "the people" protected by the right to keep and bear arms and that categorical age-based firearm bans lack the necessary historical support. Undersigned counsel obtained summary judgment against the State in the Superior Court of Delaware, striking down Delaware's ban on 18 to 20 year-olds' possession of firearms under Delaware's analog to the Second Amendment, Article I, Section 20, in *Gavin J. Birney, et al. v. Del. Dept. of Homeland Security, et al.* C.A. No. K23C-07-019 RLG (Del. Super., Oct. 2, 2025). The State's appeal of this decision is pending before the Delaware Supreme Court.

"probable cause" to remove the firearms from the individual's "custody, possession, or control." § 1448D (k)(3).

### 2. The Second Amendment's plain text covers the right to keep—and thus acquire—arms.

In a Second Amendment challenge, the initial inquiry is whether "the Second Amendment's plain text covers" the regulated conduct. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022). Delaware's Permit Bill regulates the acquisition of handguns, and as discussed below, the Supreme Court and several Courts of Appeals have recognized possession as also protected by the Second Amendment's plain text.

The Supreme Court conducted the applicable plain text analysis in *District of Columbia v. Heller*, 554 U.S. 570, 576–600 (2008); *see also Bruen*, 597 U.S. at 31–32 (relying on *Heller*'s plain text analysis). The High Court held that the Second Amendment's "textual elements": (1) "guarantee the individual right to possess and carry weapons," *id.* at 592; (2) protect the rights of "all Americans," *id.* at 531; and (3) "extend [] prima facie, to all instruments that constitute bearable arms," *id.* at 582.

Delaware's Permit Bill conditions the right of Americans to "possess" "bearable arms" upon the grant of a permit. Under *Heller*, therefore, the regulated conduct is covered by the plain text.

173922229.1

Characterizing Delaware's Permit Bill as a restriction on acquisition does not alter the analysis. The *Heller* Court consulted Samuel Johnson's and Noah Webster's dictionaries in its plain text analysis to conclude that "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'" 554 U.S. at 582. To "have" something—both historically and today—has always included its acquisition. Johnson's dictionary defined "have" as "5. To obtain" and "6. To take; to receive." 1 Samuel Johnson, *Dictionary of the English Language* (4th ed. 1773) (unpaginated).[5] Webster's defined "have" as "9. To gain; to procure; to receive; to obtain; to purchase." 1 Noah Webster, *American Dictionary of the English Language* (1828) (unpaginated).[6] Today, *Merriam Webster*'s defines "have" as "4 a: to acquire or get possession of: obtain" and to "b: receive." *Merriam-Webster's Collegiate Dictionary* 533 (10th ed. 1996). *American Heritage* defines "have" as "6.a. To come into possession of; acquire. b. To receive; get. c. To accept; take." *The American Heritage College Dictionary* 622 (3d ed. 1993).

The Second, Fifth, Ninth, Tenth, and Eleventh Circuits have all recognized a Second Amendment right to acquire arms. *See Gazzola v. Hochul*, 88 F.4th 186, 197 (2d Cir. 2023) ("The right to keep arms, necessarily involves the right to purchase them.") (quotation marks omitted); *Reese v. Bureau of Alcohol, Tobacco,*

---

[5] *Heller* relied on Johnson to define "arms," 554 U.S. at 581, "keep," *id.* at 582, "bear," *id.* at 584, and "well-regulated," *id.* at 597.

*Firearms,& Explosives*, 127 F.4th 583, 589–90 (5th Cir. 2025) ("Of course, the words 'purchase,' 'sale,' or similar terms describing a transaction do not appear in the Second Amendment. But the right to 'keep and bear arms' surely implies the right to purchase them."); *Nguyen v. Bonta*, 140 F.4th 1237, 1240 (9th Cir. 2025) ("the ability to acquire firearms through purchase without meaningful constraints [is] protected by the Second Amendment"); *Ortega v. Grisham*, 148 F.4th 1134, 1143 (10th Cir. 2025) ("Common sense dictates that the right to bear arms requires a right to acquire arms…. Legal interpretation follows that common sense."); *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1171 (11th Cir. 2025) (en banc) (Brasher, J., dissenting) ("we must decide whether the right to keep and bear arms extends to the purchase of firearms. Neither the [defendant] nor the majority opinion disputes that this first step is met in favor of the plaintiffs").

These appellate decisions are consistent with Supreme Court precedent, which demonstrates that the right to acquire arms is inherent in the right to keep arms, and that the Second Amendment—like other enumerated rights—protects concomitant rights.

At a minimum, the right to acquire arms is a necessary concomitant of the right to possess arms. "A constitution. . . . requires, that only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects, be deduced from the nature of the objects themselves."

*M'Culloch v. Maryland*, 17 U.S. 316, 407 (1819). Thus, "the [Supreme] Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 579 (1980). And "fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Id.* at 580; *see also The Federalist* No. 44 (James Madison) ("No axiom is more clearly established in law, or in reason, than that wherever the end is required, the means are authorized; wherever a general power to do a thing is given, every particular power necessary for doing it, is included.").

In the Second Amendment context, four Supreme Court Justices determined—and none disagreed—that "a necessary concomitant" of "the right to keep a handgun in the home for self-defense" is the right "to take a gun to a range in order to gain and maintain the skill necessary to use it responsibly." *New York State Rifle & Pistol Ass'n, Inc. v. City of New York*, 590 U.S. 336, 364-65 (2020) (Alito, J., joined by Gorsuch and Thomas, J.J., dissenting); *id.* at 340 (Kavanaugh, J., concurring) (expressing "agree[ment] with Justice Alito's general analysis of *Heller*"); *see also Oakland Tactical Supply, LLC v. Howell Twp., Michigan*, 103 F.4th 1186, 1192 (6th Cir.), cert. denied, 145 S. Ct. 603 (2024) (concluding that "at least some [firearms] training is protected" as "a necessary corollary to the right

defined in *Heller*" because [f]our Justices seemingly endorsed this view" in *City of New York*).

Another "necessary concomitant" of the right to keep and bear arms is the right to acquire arms:

> Constitutional rights thus implicitly protect those closely related acts necessary to their exercise. . . . The right to keep and bear arms, for example, "implies a corresponding right to obtain the bullets necessary to use them," . . . . Without protection for th[is] closely related right[], the Second Amendment would be toothless.

*Luis v. United States*, 578 U.S. 5, 26–27 (2016) (Thomas, J., concurring).

In a case *Heller* cited thrice approvingly, 554 U.S. at 608, 614, 629, the Tennessee Supreme Court held that "[t]he right to keep arms, necessarily involves the right to purchase them," *Andrews v. State*, 50 Tenn. 165, 178 (1871).

Likewise, the free press guarantee includes the right to purchase paper and ink to print newspapers. *Minneapolis Star & Trib. Co. v. Minnesota Com'r of Revenue*, 460 U.S. 575, 582 (1983). *See also Ortega v. Grisham*, 148 F.4th 1134, 1143 (10th Cir. 2025) ("the right to bear arms requires a right to acquire arms, just as the right to free press necessarily includes the right to acquire a printing press, or the right to freely practice religion necessarily rests on a right to acquire a sacred text"). The Second Amendment—which is not a "second-class right" to be "singled out for special—and specially unfavorable—treatment," *McDonald v. City of Chicago*, 561 U.S. 742, 778–79, 780 (2010)—contains implicit rights just like the First

Amendment. Indeed, "self-defense" is not among the 27 words of the Second Amendment's text, yet it is a "core protection" of the Second Amendment. *Heller*, 554 U.S. at 634.

Four Justices in *City of New York* likewise recognized a right to sell firearms, identifying "the right.… to take a gun outside the home in order to transfer ownership lawfully" as "a necessary concomitant of" the "right to keep a handgun in the home." *City of New York*, 590 U.S. at 364–65 (Alito, J., dissenting); *id.* at 1527 (Kavanaugh, J., concurring). Additionally, *Heller* identified certain regulations on "the commercial sale of arms" as "presumptively lawful," which would make little sense if commercial sales were outside the scope of the Second Amendment. 554 U.S. at 626–27 & n.26. Indeed, the other "presumptively lawful" regulations *Heller* identified—"prohibitions on the possession of firearms by felons and the mentally ill" and "laws forbidding the carrying of firearms in sensitive places," *id.* at 626—involve conduct that the Court determined is covered by the Second Amendment. *See id.* at 592 (holding that the Second Amendment protects possessing firearms); *Bruen*, 597 U.S. at 32 (holding that the Second Amendment protects publicly carrying firearms).

### 3. The Permit Bill is Not Presumptively Lawful

The State argued below that the Permit Bill is "presumptively constitutional" based on *Bruen*'s ninth footnote. App250 (Opposition Brief). Not so. The State relies

on dicta in *Bruen*'s footnote 9 which does not exempt permitting schemes from *Bruen*'s historical test.

*Bruen* repeatedly stated that the "only" way the government can justify an arms-bearing regulation is by "demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24; *see id.* at 17 ("*Only if* a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.") (quotation marks omitted and emphasis added); *id.* at 24 ("*Only*" if the government justifies its regulation with historical tradition "may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.") (emphasis added and quotation marks omitted); *id.* at 34 ("*Only if* respondents carry that burden can they show that the pre-existing right codified in the Second Amendment . . . does not protect petitioners' proposed course of conduct.") (emphasis added).

Even though it was discussing permits to carry a handgun--not permits to purchase--the Supreme Court did not decide that permitting laws are presumptively constitutional. But even regulations the Court has described as presumptively constitutional remain subject to *Bruen*'s historical test.

In *Bruen*, the Court applied its text-and-history test when considering a regulation deemed "presumptively lawful". New York unsuccessfully "attempt[ed]

to characterize [its] proper-cause requirement as a 'sensitive-place' law." *Bruen*, 597 U.S. at 30. The Court consulted "the historical record" and concluded that "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place.'" *Id.* at 30-31. *Bruen* thus held the "presumptively lawful" "sensitive place" regulation to the same historical standard that applies to all firearm regulations.

Several additional reasons, including decisions by this Court, confirm that *Bruen*'s footnote 9 does not render Delaware's law presumptively constitutional.

First, as this Court explained in *Range*, a law must be "longstanding" to be "presumptively lawful." *Range v. Att'y Gen. United States*, 124 F.4th 218, 229 (3d Cir. 2024) (en banc). And if "a law passed in 1961—some 170 years after the Second Amendment's ratification and nearly a century after the Fourteenth Amendment's ratification—falls well short of 'longstanding,'" *id.*, a regulation that took effect in 2025 certainly does.

Second, *Bruen* gave no indication that its list of features that render a permitting scheme unconstitutional—lengthy wait times, exorbitant fees, and other abusive practices—was exhaustive. To the contrary, the historical analysis is meant to identify additional burdens that lack historical support.

Third, even if footnote 9 were read to approve most shall-issue carry license regimes—though it merely suggested that some such regimes might survive

historical scrutiny even though New York's may-issue regime could not—it would not amount to a rubber stamp for more burdensome laws restricting handgun possession in "the home, where the need for defense of self, family, and property is most acute." *Heller*, 554 U.S. at 628; *see also id.* at 635 (the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.").

Fourth, the "shall-issue" permitting schemes briefly discussed in *Bruen* are entirely optional in a majority of states. In 2022, when *Bruen* was decided, a majority--26--of the 43 states broadly categorized as "shall-issue" in footnote 9 were "constitutional carry" jurisdictions where no permit is required to carry a firearm.[7] *Bruen* acknowledged this. 597 U.S. at 13 n.1. Moreover, of the 17 states *Bruen* discussed that do not allow unpermitted constitutional carry, twelve states at that time allowed open carry without a permit. *Bruen* also acknowledged this. *Id.* When drafting footnote 9, the Supreme Court was aware that in practice only a minority of states require a person to go through a permitting process before being able to carry a handgun in public for self-defense.

---

[7] Since *Bruen*, more states have passed constitutional carry laws. 29 states now have constitutional carry. (What Is Constitutional Carry? | State Gun Laws | USCCA Blog) https://www.usconcealedcarry.com/blog/constitutional-carry-in-states/) (last visited Mar. 24, 2026).

173922229.1

To the extent the "shall-issue" public carry statutes were not optional, those statutes were largely categorized as "shall issue" by *Bruen* on the basis that their language demonstrated "authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." *Bruen*, 597 U.S. at 13. *Bruen* referenced only the minimal "threshold requirements" to identify law-abiding citizens. *Id.* In contrast, the Permit Bill does not share the limited guidelines that footnote 9 identifies for a potentially constitutional "shall issue" public carry statute—and involves a materially different permit-to-purchase statute.

The Permit Bill empowers the Director, at his sole discretion, to deny a permit to any person who, "poses a danger of causing physical injury to self or others by owning, purchasing or possessing firearms." § 1448D(f)(3). This power is not reliant on a court order stating the same nor limited in time, as was the case in *United States v. Rahimi*, 602 U.S. 680, 702 (2024) ("we conclude only this: An individual found *by a court* to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment.") (emphasis added). It does not provide any objective criteria for what constitutes such a "danger." These

nuances illustrate why the State's suggestion that this Court shortcut the *Bruen* test is folly.[8]

The Supreme Court has repeatedly reinforced its Second Amendment test. *See Bruen*, 597 U.S. at 17, 24; *Rahimi*, 602 U.S. at 692 ("the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition"). Never has the Court articulated an exception for "presumptively constitutional" regulations.

Rather, the Court has expressly stated that "a court [may] conclude that the individual's conduct falls outside the Second Amendment's" protections "[o]nly if a firearm regulation is consistent with this Nation's historical tradition." *Bruen*, 597 U.S. at 17. Therefore, the state must justify the Permit Bill by proving that it is consistent with historical tradition.

---

[8] A similar dicta-based method of shortcutting *Bruen* was rejected by this Court in *Range*. There, the government urged this Court to exclude the person targeted in that case from "the people" afforded Second Amendment protection based only on the Supreme Court's reference to "law-abiding citizens" in *Heller*. 124 F.4th at 226. This Court declined that approach, noting that "the criminal histories of the plaintiffs in *Heller, McDonald, and Bruen* were not at issue in those cases. So their references to 'law-abiding, responsible citizens' were dicta. And while we heed that phrase, we are careful not to overread it as we and other circuit courts did with *Heller's* statement that the District of Columbia firearm law would fail under any form of heightened scrutiny." *Id*.

173922229.1

**4. The State Cannot Meet its Burden to Prove that the Permit Bill is Part of the Historical Tradition of Firearm Regulation**

**i. The State must present "relevantly similar" analogues for the Permit Bill from the founding era**

Having demonstrated that the Permit Bill restricts conduct covered by the plain text of the Second Amendment, *Bruen* next mandates that, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.". *Bruen*, 597 U.S. at 19. The State must do so by presenting relevantly similar historical analogues to the Permit Bill. *Id*. at 28-29. ("Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'"). This it cannot do.

The State's historical analogues must come from the founding era. *Bruen* instructed that "when it comes to interpreting the Constitution, not all history is created equal." *Id*. at 34. "'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*,'" so a Second Amendment analysis must center on the founding era. *Id*. (quoting *Heller*, 554 U.S. at 634–35)(emphasis in original); *see also Lara*, 125 F.4th at 434 ("To aid the court in that second-step analysis, the government bears the burden of identifying a 'founding-era' historical analogue to the modern firearm regulation.")

ii. **The State cannot present "relevantly similar" historical analogues from the time of the founding that justify the Permit Bill**

A review of firearms licensing laws in the pre-founding, colonial period and at the time of the founding reveals only odious restrictions based on racism. *Heller*, *Bruen*, and *Rahimi* teach that discriminatory historical laws cannot establish a tradition that the court will follow.

*Heller* refused to include in its analysis any of the discriminatory historical laws that prohibited slaves and free African Americans from possessing firearms when analyzing the District of Columbia's handgun prohibition. *Bruen* did not consider any of the racist historical laws requiring slaves and free African Americans to obtain discretionary licenses to carry arms when analyzing New York's discretionary licensing law for arms carrying, even though *amici* in the case presented many examples to the Court. *See, e.g.*, Brief for National African American Gun Association, Inc. as Amicus Curiae Supporting Petitioners at 4–11, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) (No. 20-843), 2021 WL 3072862, at *4–11.

And *Rahimi* did not consider any contemptible historical laws disarming people based on religion or race, even though numerous examples were presented to the Court, and several *amici* expressly encouraged the Court to rely on such laws. *See, e.g.*, Brief for Second Amendment Law Scholars as Amici Curiae Supporting

Petitioner at 15 n.4, *United States v. Rahimi*, 602 U.S. 680 (2024) (No. 22-915), 2023 WL 5489050, at *15 n.4.

Rather, the Supreme Court "has emphasized time and again the 'imperative to purge racial prejudice from the administration of justice.'" *Ramos v. Louisiana*, 590 U.S. 83, 128–29 (2020) (Kavanaugh, J., concurring) (quoting *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 221 (2017)). As Justice Kavanaugh asked rhetorically, "[w]hy stick by ... a practice that is thoroughly racist in its origins[?]" *Id.* at 129. The history of laws requiring permits to purchase or possess firearms parallels the ugly history of racism in this country. The only laws upon which the State could rely to support the Permit Bill are racist anti-gun restrictions that the Supreme Court has consistently rejected. This includes in Delaware.

Sadly, after the founding era, Delaware established among the most elaborate, racist permit law for possession of firearms in America, in 1832. One such distasteful law provided that: a "free negro or free mulatto" could "have use and keep in his possession a gun or fowling piece" if "one of the justices of the peace of the county in which such free negro or free mulatto resides, it shall satisfactorily appear upon the written certificate of five or more respectable and judicious citizens of the neighborhood, that such free negro or free mulatto is a person of fair character, and that the circumstances of his case justify his keep and using a gun." 8 *Laws of the State of Delaware*, From the Sixteenth Day of January, One Thousand Eight

Hundred and Thirty, to the Thirteenth Day of February, One Thousand Eight Hundred and Thirty-Five 208 (1841).[9]

Similarly racist licensing laws were passed in other states such as Virginia and Kentucky. *See, e.g.,* 1 *A Collection of All Such Acts of the General Assembly of Virginia, of a Public & Permanent Nature, as are Now in Force* 263 (2d ed. 1814).[10] 2 *A Digest of the Statute Law of Kentucky* 1150 (William Littell & Jacob Swigert eds., 1822).[11]

Founding-era permit for purchase or possession laws were discriminatory and never applied to free citizens. They applied only to slaves, freedmen, and American Indians, who at that time were considered not to be among "the people" protected by the Second Amendment. *See e.g., Aldridge v. Commonwealth*, 4 Va. 447, 449 (1824) (specifying how the Bill of Rights ... was not intended to apply to our slave population," and "free blacks and mulattoes were also not comprehended in it").

In the lower court, the State did not provide historical analogues from the appropriate era, relevantly similar to the Permit Bill, because doing so would require

---

[9]https://www.google.com/books/edition/Laws_of_the_State_of_Delaware/gkFKA AAAYAAJ?hl=en&gbpv=1&bsq=%22license%22
[10]https://www.google.com/books/edition/A_Collection_of_All_Such_Acts_of_the_ Gen/Mz4wAQAAMAAJ?hl=en&gbpv=1&bsq=%22powder%22
[11]https://www.google.com/books/edition/A_Digest_of_the_Statute_Law_of_Kentu cky/0zhFAAAAYAAJ?hl=en&gbpv=1&bsq=%22one%20gun%22.

that they resort to repugnant, racist laws that the Supreme Court has consistently declined to consider.

### iii. The Permit Bill's Training and Live-Fire Requirements are also Unconstitutional Because Historically Americans Never Had to Train to Possess Arms

The Permit Bill requires applicants to complete an 11-part firearms training course in order to be eligible to be considered for a permit. 11 *Del. C.* § 1448(D)(f)(4)a-k. This training must also include "[l]ive fire shooting exercises conducted on a range, including the expenditure of a minimum of 100 rounds of ammunition." § 1448(D)(f)(4)f. This requirement finds no support in the Nation's tradition of firearms regulation.

No law prior to the Fourteenth Amendment's ratification—including the colonial, founding, and early republic periods—preconditioned firearm ownership on training. Not the many historical laws that required people to possess arms, nor the discriminatory licensing laws that applied to slaves, freedmen, and Indians, discussed supra. In fact, some statutes expressly exempted firearm owners from militia training.

Throughout the colonial and founding eras, statutes in every state mandated gun ownership for ordinary Americans. Cumulatively, there were hundreds of legislative revisions of militia statutes. The many statutes created or retained a requirement that militiamen—typically, all able-bodied men of suitable age—keep

173922229.1

firearms, ammunition, and edged weapons at home. *See* David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495, 533-89 (2019) (covering the militia laws of the 13 original States and their colonial predecessors, plus Vermont, New Haven Colony, and Plymouth Colony). At the time of the Second Amendment's ratification, every state required ordinary citizens to own firearms. *Id*. at 537–38 (New Jersey), 542–43 (Maryland), 547–48 (North Carolina), 550 (South Carolina), 554–55 (New Hampshire), 557–58 (Delaware), 562–63 (Pennsylvania), 567 (New York), 569 (Rhode Island), 573 (Vermont), 583 (Virginia), 585 (Massachusetts), 587 (Georgia), 589 (Connecticut). These 1791 state arms mandates were continuations of mandates that had existed in the colonies since their early days—the exception being Pennsylvania, which had no arms mandate until 1777.

Many statutes also mandated firearm ownership by women and non-militiamen. These often applied to everyone old enough to conduct particular activities, such as keeping house. None required training in conjunction with the ownership requirement.

Delaware, for example, required "every Freeholder and taxable Person" starting in 1741 to "provide himself with . . . One well fixed Musket or Firelock," and "to keep such Arms and Ammunition by him, during the Continuance of this Act." George H. Ryden, *Delaware-The First State in the Union* 117 (1938). So, all

female freeholders or taxable persons, as well as males over fifty, had to possess arms, but they did not participate in militia training.

Similar laws existed in other colonies and, later, states without a training requirement. Virginia, for example required arms to travel, attend church, work in the fields, and attend court. 1 William Waller Hening, *The Statutes at Large*, at 127 (1619-1660) (1623 law requiring arms to travel); *id.* (1624, requiring arms to work in the field); *id.* (1624, requiring farmers to possess arms); *id.* at 173 (1632, travel); *id.* (1632, working in the field); *id.* (1632, men to carry arms to church).

Nearly every colony enacted a similar statute. *See, e.g.* (Maryland) *Proceedings and Acts of the General Assembly of Maryland January 1637/8—September 1664*, at 77 (William Hand Browne ed, 1883); (North Carolina) 1 *America's Founding Charters: Primary Documents of Colonial and Revolutionary Era Governance* 210–11 (Jon Wakelyn ed., 2006) (Concessions and Agreements, Jan. 11, 1664).

In sum, no historical law ever required training before acquiring a firearm. Instead, many colonial and founding era laws required firearm ownership without requiring training. Thus, there is no historical precedent for the Permit Bill's training and live fire requirements.

Additional considerations from *Bruen* further demonstrate the lack of a historical tradition of relevant regulations. First, *Bruen's* metrics of "how and why

the regulation [] burden[s] a law-abiding citizen's right to armed self-defense" are fatal to the training requirement. 597 U.S. at 29. Like the licensing requirement, the extensive training requirement effectively serves as a handgun prohibition until considerable time, money, and resources are spent by the person desiring to exercise his fundamental right to keep arms.

No historical regulation imposed a "comparable burden." Training was never a prerequisite to possessing a common firearm, nor did any analogous prerequisites exist. Therefore, no comparable historical justification existed either.

## II. The District Court Erred in Dismissing Parties Under the Claim-Splitting Doctrine

### A. Standard of Review

The trial court's ultimate decision to dismiss certain Challengers under the claim splitting doctrine is reviewed for abuse of discretion. *Walton v. Eaton Corp.*, 563 F.2d 66, 74 (3d Cir. 1977) (en banc). But any underlying legal determinations, such as whether later arising facts defeat application of the doctrine or whether dismissal was an appropriate remedy, are reviewed *de novo*. *McKenna v. City of Phila.*, 304 F. App'x 89, 92 (3d Cir. 2008). Under *Walton*, the Court will have to determine whether two cases: "(1) take place in the same court; (2) with the same defendants; (3) involving the same subject matter." *Id.*

**B. Merits of the Argument**

**1. Challengers Did Not Engage in Impermissible Claim-Splitting**

The District Court erred in its Draconian dismissal of the Challengers that are purchasers of firearms, leaving only the sellers as plaintiffs, from this action on the ground that their participation constituted impermissible claim splitting because they were also parties in *Neuberger I*. App023-025 (Memorandum Opinion). That ruling misapplied the claim-splitting doctrine and imposed an unnecessarily drastic remedy of dismissal.

The claim-splitting doctrine prevents a plaintiff from maintaining duplicative litigation involving the same parties and the same claims arising from the same transaction or occurrence. 18 *Wright & Miller's Federal Practice & Procedure* § 4404 & n.0.70, § 4406 & n.20 (3d ed. 2025); *Gen. Land Off. v. Biden*, 71 F.4th 264, 269–70 (5th Cir. 2023). But the doctrine does not apply where, as here, the claims arise in part from developments that came after the filing of the first action. *Schneider v. United States*, 301 F. App'x 187, 190 (3d Cir. 2008) (holding that the district court abused its discretion in dismissing claims that arose after the motion to amend in the first-filed case was filed); *Curtis v. Citibank, N.A.*, 226 F.3d 133, 140 (2d Cir. 2000) (finding that it was abuse of discretion for the district court to dismiss the second action asserting claims arising after the first amended complaint in the first action was filed). The doctrine is intended to promote judicial economy and

protect defendants from vexatious duplicative litigation but is not a rigid rule that bars related actions simply because they involve overlapping claims or challenge the same statute. *Curtis*, 226 F.3d at138.

Those concerns are not present here. While it is true that the counts asserted in this action largely mirror those asserted in *Neuberger I,* the material new facts and new arguments do not. Those new facts supported arguments that could not have been raised in the earlier action. For example, the Complaint in this case includes additional allegations concerning the State's faulty implementation of the Permit Bill. App054 ¶5 (Complaint). That faulty implementation results in an unconstitutional prohibition on handgun acquisition and sales. Specifically, Challengers alleged that after the implementation date they would be unable to purchase the handguns they desired because they would be unable to obtain timely and readily the permits required to do so. *Id.* This is because the application process, training requirements, and administrative infrastructure was undeveloped and imposed unlawful de facto regulations. App176-178 (Opening Brief); App279-282 (Reply Brief).

Those allegations addressed circumstances that only came into existence after the implementation date became imminent--well after *Neuberger I* was filed, and formed the basis for Challengers' request for expedited injunctive relief.

Challengers could not have reasonably anticipated that eighteen months after they filed the first action, the State would have been so feckless in not implementing the infrastructure to receive and grant applications. Nor could it have anticipated that the State would have imposed regulations without complying with the APA—when they previously lost a case, that they did not appeal, on the same issue. *See Delaware State Sportsmen's Ass'n v. Garvin*, No. CV K19C-11-001 NEP, 2020 WL 6813997, at *9–11 (Del. Super. Ct. Nov. 18, 2020). In other words, these new claims are an as-applied constitutional challenges based on later-occurring facts, which could not have been brought in *Neuberger I*, where the constitutional challenge is facial.

The District Court nevertheless punitively dismissed the Challengers who are purchasers from this instant case based on their participation in both actions. That was reversible error.

The claim-splitting doctrine does not impose such a procrustean penalty on parties where, as here, the operative facts have materially changed. *Leonard v. Stemtech Int'l, Inc.*, C.A. No. 12-86-LPS-CJB, 2012 WL 3655512, at *5–8 (D. Del. Aug. 24, 2012), *report and recommendation adopted*, 2012 WL 4591453 (D. Del. Sept. 28, 2012).

Nor are the Challengers required, as the District Court seems to suggest, to anticipate future factual developments, such as the State not following the APA and failing to put the necessary infrastructure during the *eighteen months* following

173922229.1

enactment while dispositive motions were still pending in the first action. *Trireme Energy Dev., LLC v. RWE Renewables Americas, LLC*, No. 22-CV-07439 (JLR), 2023 WL 5469662, at \*7 (S.D.N.Y. Aug. 24, 2023) (noting "the rule does not apply to claims that arose after the operative complaint was filed in the earlier action, since a plaintiff 'has no continuing obligation to file amendments to the complaint to stay abreast of subsequent events.'") (first quoting *Curtis*, 226 F.3d at 139, then citing *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1464 (2d Cir. 1996) ("If a defendant engages in actionable conduct after a lawsuit is commenced, the plaintiff may seek leave to file a supplemental pleading to assert a claim based on the subsequent conduct ... [b]ut he is not required to do so, and his election not to do so is not penalized by the application of *res judicata* to bar a later suit on that subsequent conduct.")). Because several of the factual allegations and claims asserted here were not ripe at the time of the earlier complaint, their assertion in a subsequent action is permissible. *Schneider*, 301 F. App'x at 190.

## 2. The Court Erred in Dismissing Certain Challengers

Moreover, even if the District Court believed the two actions involved improper claim-splitting, dismissal was unnecessarily harsh, as this Court teaches. When related actions involving overlapping claims are filed, district courts should ordinarily address the issue through case-management tools such as consolidation, amendment of the pleadings, or a stay of one action. *McKenna*, 304 F. App'x at 93

(recognizing the general rule that courts ordinarily should use case-management tools, but unlike this case affirming dismissal with prejudice where the plaintiff sought to assert untimely claims in a second action after the district court had denied leave to amend the earlier complaint to add the same claims, while a motion for reconsideration of that denial was pending). Those mechanisms allow courts to manage duplicative litigation while preserving potentially valid claims.

In this case, the District Court abused its discretion by dismissing certain Challengers outright without utilizing the case-management tools outlined in *McKenna*, which effectively foreclosed those parties from pursuing claims that could not have been litigated earlier, and their ability to obtain expedited injunctive relief. Such a remedy was unnecessarily harsh and contrary to the general principles that govern case management, which emphasize the need for careful consideration of less drastic measures. *See, e.g., In re Hill*, 775 F.2d 1385, 1387 (9th Cir. 1985) (holding that dismissal is a drastic sanction and constitutes an abuse of discretion where the court failed to consider less severe alternatives).

The dismissal also inequitably prejudiced the evidentiary record considered by the trial court in connection with Challengers' motion for emergency injunctive relief. The Challengers dismissed under the claim-splitting doctrine included the individuals who submitted declarations describing their efforts to obtain permits and the obstacles they encountered in attempting to comply with the statute before the

enforcement date. Those declarations formed a substantial portion of the evidentiary record, including to support injunctive relief.

The District Court's dismissal of the purchaser Challengers inflicted severe prejudice by foreclosing those Challengers' ability to obtain expedited injunctive relief. That prejudice was immediate and case dispositive as to these Challengers.

In addition, the District Court dismissed both DSSA and BPRC from this case because they were also overlapping parties—but they only partially overlapped. DSSA and BPRC plaintiffs in *Neuberger I* only included members who were purchasers of handguns. In this case, Challengers DSSA and BPRC include members who are both purchasers and sellers of handguns. App065 ¶43 (Complaint). Accordingly, by dismissing the DSSA and BPRC in this case, instead of employing consolidation for example, the District Court is leaving the members of those organizations that are sellers without any recourse. That is an abuse of discretion.

Accordingly, the Court should hold that District Court erred in finding claim-splitting. But even if this Court were to find the District Court did not err on this point, this Court should hold that the District Court abused its discretion in dismissing the "overlapping plaintiffs."

173922229.1

### III. The District Court Erred in Denying Preliminary Injunctive Relief

#### A. Standard of Review

This Court reviews a district court's ruling on a motion for preliminary injunction under a tripartite standard. Findings of fact are reviewed for clear error, legal conclusions are reviewed *de novo*, and the ultimate decision to grant or deny relief is reviewed for abuse of discretion. *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 256 n.5 (3d Cir. 2020).

Although preliminary injunction determinations are discretionary, reversal is required where the court "proceeded on the basis of an erroneous view of the applicable law." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citation omitted). An abuse of discretion occurs when the district court fails to properly apply the governing four-factor preliminary injunction framework, likelihood of success on the merits, irreparable harm, balance of equities, and the public interest. *Smith v. City of Atl. City*, 138 F.4th 759, 779 (3d Cir. 2025).

#### B. Challengers Demonstrated a Likelihood of Success on the Merits

##### 1. The Challengers Are Likely to Succeed in Showing the Permit Bill is Unconstitutional

The Challengers' emergency motion for injunctive relief advanced a theory that the State's failure to implement a functioning permitting system would operate as unconstitutional ban under the Second Amendment. In connection with the briefing of Challengers motion, the District Court, upon reviewing the briefing in

*Neuberger I,* ordered the State's response brief should include "argument as to the challenged law's consistency with the principles that underpin the nation's regulatory tradition, as set forth by *Bruen* and *Rahimi*." App.228-229 (November 5, 2025 Oral Order). In compliance with the Court's Order each of the parties addressed the *Bruen* standard in connection with the likelihood of success on the merits analysis. App250-254 (Opposition Brief); App282-284 (Reply Brief). And the Second Amendment issue was again raised at argument, App415-416 (Oral Argument Transcript), placing that substantive issue squarely before this Court for adjudication.

While the Challengers' emergency motion focused on a narrow factual theory, the District Court recognized that it may still be required to evaluate the likelihood of success under the correct Second Amendment constitutional standard as evidenced by requesting briefing on the issue. In its decision, however, the District Court treated its erroneous finding of an absence of ban as dispositive of Challengers' likelihood of success--ending its analysis without applying the governing framework under *Bruen*. That was a dispositive error.

The incorrect finding of the absence of a ban does not resolve the inquiry under *Bruen*. For the reasons explained above in Section I, the Permit Bill violates the Second Amendment and therefore, Challengers have demonstrated a strong likelihood of success on the merits of their Second Amendment claim.

### 2. The State Violates the APA

The District Court also erred in concluding that the State's withdrawal of certain "guidelines" resolved Challengers' claims regarding the State's failure to properly promulgate the regulations necessary to implement the Permit Bill in compliance with the APA.

The Permit Bill delegates regulatory authority to the State Bureau of Identification ("SBI") to adopt regulations necessary to "administer, implement, and enforce" the permitting system. § 1448D(q). It does not permit regulations that do not comply with the APA.

The State lost a decision from the Delaware Superior Court, that it did not appeal, on this exact issue and against one of the Challengers in this appeal—but the State did not learn its lesson and did not follow the legal mandates of that decision which reasoned that: Where a statute conditions lawful compliance on agency-created procedures, those procedures must be established through APA-compliant rulemaking. *See Garvin*, 2020 WL 6813997, at *9–11 (holding that the agency's guides were a "de facto regulation" subject to the rulemaking under the APA and were thus unlawful).

Yet the record demonstrates that the State made the same mistake again in this case when it attempted to implement the permit system through informal "Firearm Training Course Guidelines" issued by the Delaware State Police and SBI. App176-

178 (Opening Brief); App186-188 (Opposition Brief); App280-281 (Reply Brief). Those guidelines, which are similar to the facts in *Garvin, supra,* are de facto regulations, impose requirements not contained in the statute itself, including mandatory approval of firearms instructors and certification of training courses before such courses could be offered. App154-156 (Exhibits to Complaint); App186-188 (Exhibits to Opening Brief). These requirements are not interpretive. They are substantive conditions governing whether a citizen may satisfy the statutory prerequisites to obtain a permit.

Those requirements constitute regulations under the Delaware APA. The APA defines a "regulation" broadly to include any statement of procedure, policy, requirement, or standard promulgated by an agency to guide future conduct. 29 *Del. C.* § 10102(7). When an agency adopts such requirements, it must comply with the APA's notice-and-comment procedures, including publication of the proposed regulation and an opportunity for public comment before adoption. *Garvin*, 2020 WL 6813997, at *10.

The State did not follow those APA procedures here. Instead, it attempted to implement key components of the permitting system through informal guidance documents that, as in *Garvin,* are de facto regulations. App154-156 (Exhibit to Complaint); App186-188 (Exhibits to Opening Brief). Those actions are unlawful and make the guidelines/regulations invalid. *See, e.g., Garvin*, 2020 WL 6813997,

at \*9–11; *Baker v. Delaware Dep't of Nat. Res. & Env't Control*, No. CV S13C-08–026, 2015 WL 5971784, at \*15 (Del. Super. Ct. Oct. 7, 2015), *aff'd*, 137 A.3d 122 (Del. 2016) (holding that the agency's stormwater regulations were unlawful because they relied on technical documents not adopted under the APA).

The District Court acknowledged the APA concerns raised by Challengers, but concluded that the State's subsequent withdrawal of portions--both during and after the hearing-- cured the problem. App027 (Memorandum Opinion). Despite that extraordinary procedural "suggestion" from the District Court, the defects have not been fixed. The State's withdrawal of those provisions does not cure the APA violation. Rather, it confirms it and exacerbates its consequences. It leaves a vacuum in Permit Bill administration. The State should have used the eighteen months it had between passage and enforcement of the Permit Bill to create the regulations necessary to administer the Permit Bill in an APA-compliant manner. It did not.

The trial court's holding must be reversed because it rests on changes and representations introduced by the State after oral argument and after briefing was completed. The State's post-hearing withdrawal of regulations was only an acknowledgement that it had erred, not a cure for the defect. If Challengers had been given the opportunity to rebut these unilateral court-assisted withdrawals in the District Court they would have demonstrated, as a matter of law, their ineffectiveness.

173922229.1

Even accepting the State's withdrawals at face value, they confirm that the Permit Bill depends on substantive rules that have not been adopted in compliance with the APA. The withdrawn provisions by the State, after oral argument, concerning instructor approval and course certification existed because the Permit Bill provides no mechanism for determining which instructors are authorized to provide qualifying training or how training programs are approved. What remains is a statutory scheme that continues to require certified training, but provides no standards, procedures, or criteria governing how that requirement is satisfied.

In short, the State has withdrawn a few unlawful rules with nothing to replace the few withdrawn rules, creating a regulatory vacuum in which statutory mandates exist but no lawful framework governs compliance. The only way to fix this would be to enjoin enforcement of the Permit Bill to complete the APA notice and hearing requirements.

The State has attempted to characterize their shifting positions as "clarifications." They are not. They are regulations subject to the APA. They supply missing terms, impose new requirements, and define how the Permit Bill operates in practice. For example, the State submitted, after the hearing below, several new procedures governing instructor and course review, as well as requirements concerning permit decisions, matters not addressed in the statute itself. App372-374 (Decl. in Support of Opposition). Similarly, the State's clarification that SBI will

provide notice of any permit denial within 30 days of receiving a completed application is not what the Permit Bill says, and is impermissible gap-filling. App373. Such gap-filling is the hallmark of administrative rulemaking and must be accomplished through APA compliant procedures, not through informal guidance or post-hearing representations.

The District Court's conclusion that the State's withdrawal of certain guidelines and implementation of "clarifications" cured the APA defect was error and should be reversed.

### 3. The District Court Erred in Concluding the Infrastructure Was Sufficient

In the District Court, Challengers demonstrated that at the time the State began enforcement of the Permit Bill, it had failed to establish the infrastructure necessary to allow ordinary Delawareans to obtain a permit on a timely basis to purchase a handgun. Despite an eighteen-month runway between enactment and enforcement, the State acknowledged that it did not open the permit process to the public until approximately two weeks before enforcement. App260 ¶7 (Decl. in Support of Opposition Brief). The record further established that the State's failure to communicate with prospective firearms trainers and the general public, coupled with its last-minute approval of instructors, resulted in a severe shortage of available training opportunities at the time enforcement began. App300-301 ¶¶7-10 (Decl. in Support of Reply Brief).

173922229.1

The statutory scheme required applicants to complete qualifying training as a precondition to obtaining a handgun, yet the State failed to make that training meaningfully available. The result was predictable: ordinary, law-abiding Delawareans who sought to acquire a handgun for self-defense were unable to do so at the moment the law took effect. The State's own evidence confirmed this reality. At the time of briefing, the State was aware of only two "civilian permits" issued statewide, meaning permits issued to individuals subject to the training requirement. App261 ¶12 (Decl. in Support of Opposition Brief). That figure stands in stark contrast to the 53,370 NICS background checks conducted in Delaware in the year preceding enforcement. App308 (Exhibit in Support of Decl. in Support of Reply Brief).

The District Court erred by failing to evaluate these undisputed infrastructure deficiencies and their effect on the exercise of the right to acquire a firearm. That error was compounded by the District Court's improper dismissal of the Challengers who are purchasers, on claim-splitting grounds, which led it to assess the permitting regime primarily through the lens of Challengers who are sellers. As a result, the District Court failed to grapple with the central constitutional injury, namely that ordinary individuals subject to the statute were unable to satisfy its preconditions on a timely basis and therefore, could not obtain a handgun at all.

**C.    Challengers Demonstrated All the Other Elements Warranting Preliminary Injunctive Relief**

The District Court's analysis ended at the threshold likelihood of success inquiry and did not address the remaining requirements for preliminary injunctive relief:  irreparable harm, the balance of the equities and the public interest. Where, as here, the record permits resolution of the remaining elements, this Court may determine whether injunctive relief is warranted. *Maldonado*, 157 F.3d at 190-91. As set forth below, those remaining factors strongly favor relief.  Accordingly, this Court should reverse and direct entry of a preliminary injunction.

### 1.    Challengers demonstrated irreparable harm

The record before the District Court establishes that Challengers have demonstrated irreparable harm. This Court instructs that "[c]onstitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction," particularly in Second Amendment cases. *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 203 (3d Cir. 2024) (hereinafter "*DSSA Remand*") (cleaned up)(remanding on procedural grounds).

Unlike the facts in *DSSA Remand,* Challengers' theory of irreparable harm is not premised on the notion that "all constitutional harms [are] irreparable." *Id.* Challengers do not rely on any presumption of irreparable harm. Unlike in *DSSA*

*Remand*, where the Court described a "scant" record, the evidentiary record on irreparable harm in this appeal is extensive and thoroughly documents the imminent and irreparable injuries that Challengers face.

This appeal falls squarely within the types of harms that *DSSA Remand* recognized as irreparable when supported by evidence. This Court explained in *DSSA Remand* that irreparable harm is established where the challenged conduct threatens concrete injuries such as the loss of life, exposure to criminal liability, or the destruction of a business. *Id.* at 201. The record here demonstrates all three. Individual plaintiffs are deprived of the ability to acquire firearms for lawful self-defense; sellers face criminal exposure and the collapse of core business operations; and both sets of harms are exacerbated by the State's use of an unlawful and standardless administrative regime. *See, e.g.* App288-296, App299-304, App335-341 (Decls. In Support of Reply Brief). Thus, Challengers have provided precisely the type of concrete, non-speculative evidence that this Court requires.

The record in this appeal demonstrates that the permitting regime was not capable of functioning in a manner that allowed ordinary citizens to obtain permits and exercise their rights at the time of enforcement on a timely basis. *Id*. The State's failure to comply with the APA independently reinforces the irreparable nature of these harms.

The record reflects that key components of the permitting regime—including the approval and regulation of firearms training instructors—were implemented through informal "guidelines" and ad hoc processes rather than through duly promulgated rules under the APA. App154-156 (Exhibit to Complaint); App173-174 (Opening Brief); App280-281 (Reply Brief). As a result, applicants were required to satisfy prerequisites governed by shifting, undefined standards.

That lack of lawful rulemaking did not merely result in non-compliance with the APA. The Permit Bill affords the State up to thirty days to process applications, without any mechanism to ensure timely issuance or to provide relief for delays. As a result, even individuals who could begin the process before enforcement had no avenue for relief if they did not receive a permit before the statute took effect.

To the extent the State relied on post-hearing submissions asserting that aspects of the permitting system had been implemented, those assertions were accepted by the District Court without affording Challengers an opportunity to test them through rebuttal. App027 (Memorandum Opinion); App367 (Post-Oral Argument Letter of the State). Even crediting those late submissions, however, they do not alter the core showing of irreparable harm reflected in the record: that ordinary law-abiding citizens lacked a realistic ability to obtain permits and acquire handguns at the time enforcement began.

The irreparable harm is ongoing. Once the statute took effect, Challengers became subject to a regime that prevents them from acquiring handguns absent compliance with a process that, on this record, was not meaningfully available. *See, e.g.*, App288-296; App299-304; App335-341 (Decls. In Support of Reply Brief) (describing, under oath, why Thomas Neuberger and several DSSA members lack handguns for self-defense, are currently fearful for their personal safety and the safety of their loved ones, and cannot reasonably outrun or physically resist an attacker).

This deprivation of the ability to obtain firearms for lawful self-defense constitutes irreparable injury. *See, e.g.*, *Koons v. Attorney General of New Jersey*, 156 F.4th 210, 273 (3d Cir. 2025), rehearing *en banc* granted, *vacated* 164 F.4th 100 (3d Cir. 2025) (acknowledging that depriving licensees of the ability to use firearms under certain circumstances is a deprivation of a measure of self-defense that may constitute irreparable harm).

The inability to obtain firearms for lawful self-defense is a paradigmatic irreparable harm. The Second Amendment protects the right of law-abiding citizens to acquire and possess arms for lawful purposes. A regulatory regime that prevents citizens from obtaining those arms—even temporarily—inflicts immediate and irreparable constitutional injury. *See, e.g.*, *Koons* 156 F.4th at 273 (negative procedural history explained *supra*).

173922229.1

The Permit Bill imposes criminal liability on any dealer who transfers a handgun without compliance with the Permit Bill. As a result, sellers are forced to choose between ceasing handgun sales—the core of their business—or risking criminal prosecution under a regime that, on this record, was not meaningfully operable. The irreparable harm of exposing regulated parties to criminal liability while imposing unlawful regulations compounds the harm.[12]

In sum, the record demonstrates that enforcement of the statute imposed immediate and concrete deprivations of constitutional rights and exposed Challengers to serious and irreparable harms, warranting injunctive relief.

### 2. The Balance of Equities and Public Interest Favor Relief

Where the State is the opposing party, the balance of equities and the public interest merge. *See ACLU v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003) ("[N]either the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law.") Both factors strongly favor relief.

The State has imposed continuing harm on Challengers, who remain subject to a statutory scheme that exposes them to the loss of core constitutional rights, the threat of criminal prosecution, and the inability to protect themselves and their

---

[12] This harm is compounded even further as a result of the textual contradiction, ambiguity, and inconsistency noted in footnote 2 above, at 18.

173922229.1

families, and loss of their business. By comparison, there is no inequity if the State is barred from enforcing a statute that violates the rights of its citizens.

The public interest likewise favors an injunction. Courts have repeatedly recognized that the public has no interest in the enforcement of unconstitutional laws. *K.A. v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013) (citing *ACLU*, 322 F.3d at 251 n.11). That principle is reinforced here by the public interest in ensuring that agencies comply with statutory rulemaking requirements before imposing binding obligations backed by criminal penalties. Allowing the State to enforce a system built on noncompliant "guidelines" and "clarifications" would undermine the procedural safeguards the APA is designed to protect and erode confidence in the rule of law.

For these reasons, both the balance of equities and the public interest strongly favor injunctive relief.

173922229.1

**CONCLUSION**

The Challengers have demonstrated that controlling authority of the United States Supreme Court and this Court, as applied to this appeal, support the necessary conclusions that:

- The State cannot satisfy its burden, mandated by *Bruen, Rahimi, Range, and Lara,* that the Permit Bill is consistent with the Nation's tradition of firearm regulation during the founding era. Therefore, the Permit Bill cannot pass muster under controlling Second Amendment precedent, and the prerequisites to purchasing a handgun—even for possession in the home—cannot be upheld under applicable precedent.

- The District Court abused its discretion by punitively dismissing—instead of consolidating—an earlier case filed by the Challengers, whose facts became mooted, when the subsequent case that is the subject of this appeal was based on material new facts and new allegations that did not exist, and could not have been predicted, at the time the earlier case was filed.

- If this Court decides the merits of the substantive Second Amendment and the Delaware's Administrative Procedures Act ("APA") issues, consistent with the teachings of its prior opinions, it need not decide whether the Challengers are entitled to injunctive relief, or related procedural issues. In the event this Court were to address the issue of injunctive relief, Challengers have satisfied

all the preliminary injunction factors. Enforcement of the Permit Bill—before implementation of regulations that comply with the APA—would rely on unlawful regulations that infringe on the rights of law-abiding citizens to acquire handguns for lawful purposes, including for self-defense in the home.

In sum, the Challengers respectfully request that this Court rule in their favor on the merits and, if necessary, remand this case to the District Court for proceedings consistent with this Court's decision.

Respectfully submitted,

LEWIS BRISBOIS
  BISGAARD & SMITH LLP

*/s/ Francis G.X. Pileggi*
Francis G.X. Pileggi, Esquire (#2624)
500 Delaware Ave., Suite 700
Wilmington, DE 19801
(302) 985-6000
Francis.Pileggi@LewisBrisbois.com

Alexander MacMullan, Esquire
LEWIS BRISBOIS
  BISGAARD & SMITH LLP
565 E. Swedesford Road, Suite 303
Wayne, PA 19087
Alexander.MacMullan@LewisBrisbois.com

OF COUNSEL:
Joseph G.S. Greenlee, Esquire
National Rifle Association of
America–Institute for Legislative
  Action
11250 Waples Mill Road
Fairfax, VA  22030

*Counsel for Appellants*

Dated: March 25, 2026

## CERTIFICATE OF BAR MEMBERSHIP

I hereby certify that at least one attorney whose name appears on this Brief is a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.


Dated:  March 25, 2026                    Respectfully submitted,

*/s/ Francis G.X. Pileggi*
Francis G.X. Pileggi, Esquire

# CERTIFICATE OF COMPLIANCE

1.     This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) in that it contains 12,764 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14 point, Times New Roman.

3.     The electronic copy of the Brief has been scanned for viruses using Sophos virus detection program and none were detected.

Dated:  March 25, 2026          Respectfully submitted,

*/s/ Francis G.X. Pileggi*
Francis G.X. Pileggi, Esquire

# CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2026, the foregoing document was served

on all parties or their counsel of record through the CM/ECF system.


Dated:  March 25, 2026                          Respectfully submitted,

*/s/ Francis G.X. Pileggi*
Francis G.X. Pileggi, Esquire

# <u>CERTIFICATE OF ELECTRONIC FILING</u>

I hereby certify that the text of the electronic Brief filed through the CM/ECF system is identical to the text in the paper copies that will be dispatched for delivery to the Clerk of the Court of the United States Court of Appeals for the Third Circuit.

Dated:  March 25, 2026

Respectfully submitted,

*/s/ Francis G.X. Pileggi*
Francis G.X. Pileggi, Esquire