No. 25-03250

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

THOMAS NEUBERGER, *et al.*,

*Plaintiffs-Appellants*,

*v.*

CABINET SECRETARY DELAWARE DEPARTMENT OF SAFETY, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Delaware
Dist. Ct. No. 1:25-cv-01341-MN

**BRIEF OF BRADY CENTER TO PREVENT GUN VIOLENCE AND
GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE AS *AMICI
CURIAE* IN SUPPORT OF APPELLEES**

Douglas N. Letter
Shira Lauren Feldman
Tess M. Fardon
Brady Center to Prevent Gun Violence
840 First Street NE, Suite 400
Washington, DC 20002
(202) 370-8100

Joseph A. Greenaway, Jr.
Purti Pareek
Tess Saperstein
Stephen P. Driscoll
Arnold & Porter
Kaye Scholer LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000

William T. Clark
Leigh Rome
Giffords Law Center
to Prevent Gun Violence
244 Madison Ave., Suite 147
New York, NY 10016
(202) 964-5134

Michael Mischke
Arnold & Porter
Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000

May 29, 2026

# CORPORATE DISCLOSURE STATEMENT

*Amici* Brady Center to Prevent Gun Violence and Giffords Law Center to Prevent Gun Violence each states that it does not have a parent corporation and that no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ........................................................................ iii

INTERESTS OF *AMICI CURIAE* ...............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .....................................2

ARGUMENT ..........................................................................................4

I.   THE COURT NEED NOT REACH THE MERITS.....................................4

II.  DELAWARE'S PERMIT-TO-PURCHASE LAW IS
     CONSTITUTIONAL...........................................................................6

   A. Delaware's Statute is Presumptively Constitutional as a "Shall-Issue"
      Law ...........................................................................................9

   B. This Court Can and Should Consider All Post-Founding Era Laws.............11

   C. Laws During and After the Founding Era Provide Ample Historical
      Support to Satisfy Step Two of the Bruen Inquiry .........................15

CONCLUSION.....................................................................................29

CERTIFICATE OF BAR ADMISSION ...................................................30

CERTIFICATE OF SERVICE .................................................................31

CERTIFICATE OF COMPLIANCE ..........................................................32

**Page(s)**

**Cases**

*Antonyuk v. James*,
120 F.4th 941 (2d Cir. 2024) ........................................................................15

*Atkinson v. Garland*,
70 F.4th 1018 (7th Cir. 2023) .....................................................................4, 6

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) ..........................................................................6

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .............................................................2, 18, 20, 24, 25

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022) ......................................................................................14

*Hanson v. D.C.*,
120 F.4th 223 (D.C. Cir. 2024) ....................................................................15

*Hanson v. D.C.*,
145 S. Ct. 2778 (2025) ..................................................................................16

*Kanter v. Barr*,
919 F.3d 437 (7th Cir. 2019) ........................................................................14

*Kipke v. Moore*,
165 F.4th 194 (4th Cir. 2026) .......................................................................16

*Lara v. Commissioner*,
125 F.4th 428 (3d Cir. 2025) ...................................................................16, 17

*Maryland Shall Issue, Inc. v. Moore*,
116 F.4th 211 (4th Cir. 2024) .................................................................6, 9, 10

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) .................................................................................15, 24

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) ........................... 2, 4, 5, 7, 9, 10, 15, 16, 17, 18, 20, 21, 25, 28

*Ocean State Tactical, LLC v. Rhode Island,*
  95 F.4th 38 (1st Cir. 2024)................................................................16

*Ocean State Tactical, LLC v. Rhode Island,*
  145 S. Ct. 2771 (2025)....................................................................16

*Range v. Att'y Gen.,*
  124 F.4th 218 (3d Cir. 2024) ...........................................8, 13, 26, 27

*United States v. Duarte,*
  137 F.4th 743 (9th Cir. 2025)...........................................................12

*United States v. Harrison,*
  153 F.4th 998 (10th Cir. 2025) .........................................................27

*United States v. Hunt,*
  123 F.4th 697 (4th Cir. 2024) ..........................................................12

*United States v. Jackson,*
  110 F.4th 1120 (8th Cir. 2024) ...................................................12, 27

*United States v. Rahimi,*
  602 U.S. 680 (2024)........................... 2, 7, 16, 17, 21, 25, 26, 28

*United States v. Sineneng-Smith,*
  590 U.S. 371 (2020)............................................................................5

*United States v. Smith,*
  No. 24-60600, 2025 WL 2938691 (5th Cir. Oct. 16, 2025) ...............6

*United States v. Williams,*
  113 F.4th 637 (6th Cir. 2024) .....................................................12, 27

*Zherka v. Bondi,*
  140 F.4th 68 (2d Cir. 2025) .............................................................12

**Constitutions**

Va. Decl. of Rights § 13 (1776)...........................................................22

**Statutes**

11 Del. C.
§ 1448D(b) ...............................................................................11, 18, 20, 22
§ 1448D(b)(1) .............................................................................................18
§ 1448D(d) ..................................................................................................20
§ 1448D(d)(1) .............................................................................................18
§ 1448D(f) ...................................................................................................21
§ 1448D(f)(3) ...........................................................................3, 10, 25, 28
§ 1448D(f)(4) ...........................................................................3, 10, 21, 22
§ 1448D(h) ..............................................................................11, 20, 21
§ 1448D(h)(1) .................................................................................3, 10, 18

2 Edw. 3, c. 3 (1328) ...........................................................................................28

Act of Feb. 4, 1806, ch. XCIV, 1805–1806 Va. Acts 51 ......................................19

Act of May 8, 1792, Chapter 33, § 7, 1 Stat. 271 ...........................................23, 24

Acts and Laws of His Majesty's Province of New Hampshire ch. 11, §
5 (1771) ............................................................................................................28

1893 Fla. Laws 71–72 ....................................................................................20, 21

Jersey City, N.J., Ordinance to Re-organize the Local Government of
Jersey City § 3 (1874) ................................................................................19, 21

Mass. Province Laws Chapter 18, § 6 (1692) .....................................................28

N.Y.C., N.Y., Ordinances ch. 8, art. 27, § 265 (1881) ..................................19, 20

1779 N.Y. Laws, ch. 55 (1780) ............................................................................23

1781 N.Y. Laws, ch. 27 (1782) ............................................................................23

1821 Tenn. Pub. Acts 63, Chapter 55, § 2 .....................................................23, 24

1837 Vt. Acts & Resolves 38, Chapter 10, § 2 ...................................................24

**Other Authorities**

1 *Journal of the Second Session of the Senate of the United States of
America*, Jan. 4, 1790 (1820) ..........................................................................24

37 *Documentary History of the Ratification of the Constitution* 253 (John P. Kaminski et al. eds., 2020) ....................................................22

*The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents* (1787), reprinted in 2 *The Documentary History of the Ratification of the Constitution* (Merrill Jensen et al. eds., 1976).....................................28

Eric Foner, THE SECOND FOUNDING: HOW THE CIVIL WAR AND RECONSTRUCTION REMADE THE CONSTITUTION (2019)....................................16

Jacob D. Charles, *The Dead Hand of a Silent Past: Bruen, Gun Rights, and the Shackles of History*, 73 Duke L.J. 67 (2023)............................15

Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* (1994)....................................................23

K. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022)............................................15

Massachusetts Convention Journal (Feb. 6, 1788), reprinted in 6 *Documentary History of the Ratification of the Constitution* (John P. Kaminski et al. eds., 2000) ....................................................29

Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. Davis L. Rev. Online 65 (2021) ............18, 19

Transcript of Oral Argument, *Wolford v. Lopez*, No. 24-1046 (U.S. Jan. 20, 2026), https://www.supremecourt.gov/oral_arguments/ argument_transcripts/2025/24-1046_hejm.pdf...................................13

W. Baude & S. Sachs, *Originalism and the Law of the Past*, 37 L. & Hist. Rev. 809 (2019) .....................................................5

4 William Blackstone, *Commentaries on the Laws of England* 251 ......................28

Pursuant to Federal Rule of Appellate Procedure 29, the Brady Center to Prevent Gun Violence and the Giffords Law Center to Prevent Gun Violence respectfully submit this brief as *amici curiae* in support of Defendants-Appellees. All parties have consented to the filing of this brief.[1]

## INTERESTS OF *AMICI CURIAE*

*Amicus curiae* Brady Center to Prevent Gun Violence (Brady) is the Nation's longest-standing nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, and legal advocacy. Brady has a substantial interest in ensuring that the U.S. Constitution is construed to protect the authority of democratically elected officials seeking to address the Nation's gun violence epidemic.

*Amicus curiae* Giffords Law Center to Prevent Gun Violence (Giffords) is a survivor-led nonprofit policy organization dedicated to researching, writing, enacting, and defending laws and programs proven to reduce gun violence and save lives. It was founded over thirty years ago following a shooting at a San Francisco law firm and was renamed the Giffords Law Center in 2017 after joining forces with the gun-safety organization led by former Congresswoman Gabrielle Giffords.

---

[1] No party's counsel authored this brief in whole or in part. Nor did any party or party's counsel, or any other person other than *amici curiae*, their members, or their counsel, contribute money that was intended to fund the preparation or submission of this brief.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

*Amici* agree with Delaware that this case may be resolved without reaching the history-and-tradition inquiry at the second step of the framework set forth in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022). This Court should either decide the case on procedural grounds or decide that the challenged Delaware permit-to-purchase statute is constitutional under step one of the *Bruen* analysis. This Court may affirm either because the district court properly denied preliminary injunctive relief on claim-splitting grounds or because Delaware's objective and nondiscretionary permit-to-purchase requirements fall outside the Second Amendment's plain-text protection under the first step of the *Bruen* framework. Other courts consider the "presumptively constitutional" question at step two of *Bruen*.

Regardless, the result is the same. Delaware's permit-to-purchase law is presumptively constitutional as a "shall-issue" law and each component of the law "is consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 692 (2024) (citing *Bruen*, 597 U.S. at 26–31). The scheme does not disarm "law-abiding, responsible citizens." *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). The law requires that prospective purchasers complete objective background verification, fingerprinting, and firearms-training requirements before acquiring a handgun. These are not novel requirements.

If the Court proceeds to step two, the relevant history is dispositive. Governments have always conditioned firearm access on proven fitness, civic standing, and accountability to public safety. Delaware's permitting scheme is the contemporary expression of that tradition. The scheme has three principal components: a comprehensive background investigation including fingerprinting and a search of the National Instant Criminal Background Check System (NICS), 11 Del. C. § 1448D(h)(1); denial authority where probable cause supports a finding of dangerousness, *id.* § 1448D(f)(3); and completion of a certified firearms-training course within the preceding five years, *id.* § 1448D(f)(4). A permit shall issue within thirty days unless grounds for denial exist.

This scheme is objective and ministerial. Further, each component of the permitting statute finds support in historical tradition as *Bruen* and *Rahimi* require. Founding-era militia laws required government authorization and competence as a condition of arms-bearing. Colonial and antebellum governments conditioned possession of firearms on proof of loyalty and civic standing. Reconstruction-era laws reinforced that framework. This Court should therefore affirm the district court's denial of a preliminary injunction and uphold the Delaware permit-to-purchase law as constitutional.

## ARGUMENT

## I. THE COURT NEED NOT REACH THE MERITS

This Court need not reach the merits of Plaintiffs' Second Amendment argument and should affirm on procedural grounds, which formed the basis of the district court's decision. As the court noted, "[t]his case is related to an earlier-filed action," and in both cases, "overlapping Plaintiffs allege the same counts against the same Defendants, serving in substantially the same capacities." AA 20–21. The scope of the district court's order was narrow; the court dismissed the overlapping Plaintiffs on claim-splitting grounds and found that the two remaining Plaintiffs failed to show a likelihood of success on the merits for reasons unrelated to the *Bruen* analysis. AA 24, 28. Although the district court's order provides reason enough to affirm, this case is an improper vehicle for this Court to address Second Amendment arguments without the opportunity to develop and analyze a historical record.

Despite the underdeveloped record below, Plaintiffs ask the Court to conduct an exhaustive history-and-tradition analysis. However, such an analysis based on the current record would contradict *Bruen*'s statement that "[c]ourts are . . . entitled to decide a case based on the historical record compiled by *the parties*." 597 U.S. at 25 n.6 (emphasis added); *see also Atkinson v. Garland*, 70 F.4th 1018, 1020 (7th Cir. 2023) ("The parties' briefing on appeal only scratches the surface of the historical analysis now required by *Bruen*. In these circumstances, we think the best course is

4

to remand to allow the district court to undertake the *Bruen* analysis in the first instance.").

In *Bruen*, the dissent questioned whether "lower courts have the research resources necessary to conduct exhaustive historical analyses in every Second Amendment case." *Id.* at 107 (Breyer, J., dissenting). In response, the majority clarified that judges would not be responsible for conducting historical research because "in our adversarial system of adjudication, we follow the principle of party presentation." *Id.* at 25 n.6 (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020)). The majority stated that judges would not be expected to "resolve historical questions in the abstract," but would "resolve *legal* questions presented in particular cases or controversies." *Id.* Because the historical inquiry "relies on 'various evidentiary principles and default rules' to resolve uncertainties," the majority concluded that courts applying the history-and-tradition test would decide each case "based on the historical record compiled *by the parties*." *Id.* (quoting W. Baude & S. Sachs, *Originalism and the Law of the Past*, 37 L. & Hist. Rev. 809, 810–11 (2019)) (emphasis added). Here, the parties were not afforded the opportunity to compile such a record. The district court did not—and could not, given the expedited timeline and sparse record—conduct any of the analysis contemplated by *Bruen*.

Courts of appeals have recognized the difficulty of conducting a *Bruen* analysis based on a thin record. *See Atkinson,* 70 F.4th at 1023 (remanding facial challenge where "the parties should have a full and fair opportunity to develop their positions before the district court"); *Baird v. Bonta*, 81 F.4th 1036, 1047 (9th Cir. 2023) (remanding facial and as-applied challenge, stating "[i]t is the parties' duty, not the court's, to collect and present historic analogues."); *United States v. Smith*, No. 24-60600, 2025 WL 2938691, at *2, n.4 (5th Cir. Oct. 16, 2025) (remanding so the district court could apply the *Bruen* framework in the first instance because the district court "has the full set of tools available to resolve the parties' historical dispute"); *but see Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 220 n.7 (4th Cir. 2024) (observing that although "the *Bruen* framework raises questions that in many cases will require additional factual development before the district court . . . the Supreme Court's clear guidance on 'shall-issue' licensing laws and the nature of the plaintiffs' constitutional challenge render additional factual development unnecessary."). If the Court reaches the merits of Plaintiffs' Second Amendment arguments, the Court should remand to the district court for a full development of the historical record.

## II. DELAWARE'S PERMIT-TO-PURCHASE LAW IS CONSTITUTIONAL

Although the Court need not reach step two of the *Bruen* analysis, *amici* address it in the alternative. Under step two, the government must show that the

challenged regulation is consistent with the Nation's historical tradition of firearm regulation. *Bruen*, 597 U.S. at 26. To show this, a court must analyze historical laws analogous to the statute being challenged. *Id.*

Plaintiffs read that standard as requiring near-identical historical precursors. Appellants' Br. at 31. The Supreme Court has rejected that understanding of *Bruen*. *Bruen* expressly declined to impose a "regulatory straightjacket [sic]," *Bruen*, 597 U.S. at 30, holding instead that the government need only show a "well-established and representative historical analogue" that is "relevantly similar" to the challenged regulation in "how and why" it burdens the Second Amendment right, *id.* at 28–30. A regulation that is "analogous enough to pass constitutional muster" survives, even if it lacks a historical counterpart that operates through identical mechanisms. *Id.* at 30. In *Rahimi*, the Court was even more direct: *Bruen* did not create "a law trapped in amber." *Rahimi*, 602 U.S. at 691. "As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id*. at 692 (citing *Bruen*, 597 U.S. at 26–31). In both *Bruen* and *Rahimi*, the Court recognized that the Constitution "can, and must, apply to circumstances beyond those the Founders specifically anticipated," even as its meaning remains anchored to the understandings of those who ratified it. *Bruen*, 597 U.S. at 28; *Rahimi*, 602 U.S. at 691–92 ("[T]he Second Amendment permits more than just those regulations identical to ones that could be

found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers.").

This Court's en banc decision in *Range* further elucidates how a court should conduct the history-and-tradition inquiry. *Range v. Att'y Gen.*, 124 F.4th 218 (3d Cir. 2024) (en banc). The Court confirmed that the relevant question is whether the *type* of burden a modern regulation imposes finds support in historical practice, and whether the burden imposed by the modern-day government regulation has historical analogues. *Id.* at 228.

Two methodological points follow from that framework. First, the historical record can be composed of statutes and regulations whose origins were discriminatory yet nevertheless have analogical force and therefore may be considered by a court. *Id.* at 230–31 (discussing laws that disarmed Quakers, Catholics, Loyalists, and others). *Bruen*'s inquiry asks what historical practice reveals about the *principles* governments have applied to firearms regulation—not whether every application of those principles was just. *Id.* (omitting any discussion of whether historical laws reflected modern moral judgments). Second, Delaware's law must be analyzed through the whole spectrum of historical statutes, not just those from the Founding era. *Id.* Both earlier and later history are instructive about the underlying principles affecting the right to keep and bear arms. Here, the main question is whether history reflects a tradition of governments conditioning firearm

access based on a purchaser's demonstrated responsibility, fitness, and possible dangerousness. The answer is a resounding yes, and Delaware's statute is a direct descendant of that tradition.

**A.** ***Delaware's Statute is Presumptively Constitutional as a "Shall-Issue" Law***

*Bruen* specifically distinguished discretionary "may-issue" schemes from objective "shall-issue" schemes that "often require applicants to undergo a background check or pass a firearms safety course" and are designed to ensure that those with firearms are "law-abiding, responsible citizens." 597 U.S. at 38 n.9. Such schemes are presumptively constitutional as long as they employ "narrow, objective, and definite standards" and are not administered in an abusive manner.[2] *Id.*

*Bruen*'s discussion of objective "shall-issue" licensing schemes offers substantial guidance in evaluating modern firearm permitting laws. *See Maryland Shall Issue*, 116 F.4th at 231–36 (Rushing, J., concurring) (explaining that *Bruen*'s footnote nine must be understood as part of the Court's broader analogical framework under which modern firearm regulations need only be "relevantly similar" to historical traditions in "how and why" they burden the Second Amendment right.). The examination of "shall-issue" licensing laws cannot be

---

[2] Because courts analyze this "presumptively constitutional" question at either step one or step two, this provides an independent reason for the Court to affirm. Regardless, Delaware's statute is consistent with history and tradition, and is an additional reason to hold the statute as constitutional.

dismissed as an aside because the Supreme Court contrasted constitutional "shall-issue" schemes with unconstitutional discretionary carry laws. *Id.* at 232. "Shall-issue" licensing systems burden the right in a constitutionally permissible way because the licensing systems use "narrow, objective, and definite standards" to identify individuals historically subject to disarmament. *Id.* at 232–35.

Delaware's permit-to-purchase law is presumptively constitutional as a nondiscretionary "shall-issue" firearm licensing law. The statute requires applicants to complete fingerprinting, background investigations, a NICS check, 11 Del. C. § 1448D(h)(1), and a certified firearms-training course within the preceding five years, *id.* § 1448D(f)(4). It allows denial only upon objective statutory grounds, including probable cause to believe the applicant poses a danger to oneself or others. *Id.* § 1448D(f)(3). A permit must be issued within thirty days, absent disqualifying circumstances. *Id.* § 1448D(h)(1).

Like the licensing systems discussed in *Bruen* and *Maryland Shall Issue*, Delaware's law imposes only objective and administrable prerequisites designed to ensure that handgun purchasers are law-abiding and trained, and do not pose a risk of misuse. The statute does not deny law-abiding citizens access to handguns. Nor does Delaware's law resemble the kinds of abusive licensing practices that might present constitutional problems. *See Bruen*, 597 U.S. at 38 n.9 (noting concerns with "lengthy wait times" or "exorbitant fees"). Delaware's scheme has a mandatory

10

issuance timeline, objective criteria, and no open-ended discretion to deny permits based on subjective judgments. *See* 11 Del. C. § 1448D(b), (h).[3]

**B. *This Court Can and Should Consider All Post-Founding Era Laws***

*Bruen* requires that courts consider the breadth of history and tradition, including discriminatory or otherwise objectionable laws. The question is what historical practice reveals about the principles underlying firearms regulation—not whether every application of those principles was just. Plaintiffs argue that this Court should ignore historical regulations that were discriminatory. Appellants' Br. at 32–35. But this narrowing of *Bruen* is inconsistent with circuit precedent and Supreme Court guidance.

Courts of appeals have repeatedly considered laws that disarm groups on the basis of race, religion, or politics as part of the *Bruen* analysis. Although laws that classified "people as dangerous simply because of their race or religion [were] wrong from the beginning and unconstitutional from 1868," such laws nevertheless "provide insight into how early Americans conceived of the right to bear arms

---

[3] Plaintiffs' central premise that the Delaware statute amounts to a total ban on handgun possession is wrong. *See* AA 67 (referring to "outright ban[]" of "right to keep and bear arms"). The district court explicitly rejected Plaintiffs' characterization of the Delaware statute. AA 10 ("[Plaintiffs] have [not] made a 'clear showing' that the State's infrastructure is not sufficient 'to enable any eligible Delaware adult resident to readily apply for and obtain the required handgun qualified purchaser permit . . .'"). This Court should hold the same.

embodied in the Second Amendment." *United States v. Williams*, 113 F.4th 637, 656 (6th Cir. 2024).

The Second Circuit has reviewed discriminatory laws in conducting step two of the *Bruen* analysis. The court explained that "we cite [these laws] not as examples to be followed but rather, according to the analysis the Supreme Court has directed we undertake, as examples of a historical tradition of broad categorical restrictions on firearms possession." *Zherka v. Bondi*, 140 F.4th 68, 90–91 (2d Cir. 2025). The Fourth Circuit described laws that disarmed "non-Anglican Protestants" or Loyalists as "relevant here in determining the historical understanding of the right to keep and bear arms." *United States v. Hunt*, 123 F.4th 697, 706–07 (4th Cir. 2024) (quoting *United States v. Jackson*, 110 F.4th 1120, 1126–27 (8th Cir. 2024)); *see also United States v. Duarte*, 137 F.4th 743, 760 (9th Cir. 2025) (en banc) ("To be clear, these laws reflect overgeneralized and abhorrent prejudices that would not survive legal challenges today. And many of these laws would likely be unconstitutional today under *other* parts of the Constitution. But these laws are reflective of American history and tradition."). These analyses show that courts should closely consider laws even with tainted histories because they explain the historical underpinnings of the "how" and "why" of a modern-day firearms regulation.

This Circuit has alluded to that same approach. Judge Krause, in her *Range* concurrence, articulated a framework for analyzing discriminatory historical

analogues. She explained that historical disarmament laws targeting "untrustworthy" categories were repugnant in their original applications but reflect a regulatory principle that, abstracted to neutral modern criteria, can support contemporary firearm regulation. 124 F.4th at 267 (Krause, J., concurring in the judgment). Older laws may be a "sordid relic" yet still offer principles from a broader tradition bearing on firearms regulations. *Id*. at 266.

Justice Jackson and Justice Barrett have also indicated that discriminatory laws should be considered in a *Bruen* analysis. During oral argument in *Wolford v. Lopez*, Justice Jackson pressed counsel on whether courts may rely on the 1865 Louisiana Black Code as a historical analogue for firearm regulations. Transcript of Oral Argument at 71–73, *Wolford v. Lopez*, No. 24-1046 (U.S. Jan. 20, 2026), https://www.supremecourt.gov/oral_arguments/argument_transcripts/2025/24-1046_hejm.pdf. Justice Jackson stated: "The fact that the Black Codes were at some later point determined themselves to be unconstitutional doesn't seem to me to be relevant to the assessment that *Bruen* is asking us to make." *Id*. at 71:15–19. She further noted that the Black Codes "were not deemed unconstitutional at the time that they were enacted. They were part of the history and tradition of the country." *Id*. at 72:1–4.

Justice Barrett (who joined the majorities in *Bruen* and *Rahimi*) has similarly considered discriminatory laws when analyzing historical firearm regulations. In

2019, then-Judge Barrett considered laws disarming racial and religious minorities to analyze whether "historical practice supports a legislative power to categorically disarm felons." *Kanter v. Barr*, 919 F.3d 437, 457 (7th Cir. 2019) (Barrett, J., dissenting).

The Supreme Court has considered discriminatory laws when examining history and tradition in other contexts. For instance, in *Dobbs v. Jackson Women's Health Org.*, the majority and dissent grappled with what the country's history and tradition of abortion restrictions revealed about the State's authority to regulate abortion. 597 U.S. 215, 241–50 (2022); *id*. at 371–80 (Breyer, Sotomayor & Kagan, JJ., dissenting). The majority relied upon a historical record that, according to the dissent, reflected outdated views about women, fetal life, and medical practice. *Id.* at 370–73. The dissent noted that, historically, women were not seen "as full members of the community." *Id.* at 372. Nonetheless, the Court relied on these discriminatory views in concluding that a right to abortion was not deeply rooted in the Nation's history and tradition. *Id.* at 241–50 (Majority Op.).

Although abhorrent, historical discriminatory laws provide insight into how early Americans viewed firearm regulations and the Second Amendment's possible application to such regulations. These laws are properly considered by this Court as part of the *Bruen* analysis.

**C.** *Laws During and After the Founding Era Provide Ample Historical Support to Satisfy Step Two of the Bruen Inquiry*

*Bruen* does not limit the historical inquiry to 1791. The Supreme Court itself analyzed Reconstruction-era evidence when it applied its own framework, 597 U.S. at 27, 60, and for good reason: the Second Amendment applies to the states through the Fourteenth Amendment, ratified in 1868. *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010).[4] A rule that makes the Second Amendment fully applicable to the states at Reconstruction but then measures its scope exclusively by 1791 standards would be anomalous—and the Second Circuit has said so directly. *Antonyuk v. James*, 120 F.4th 941, 972 n.16 (2d Cir. 2024) ("[W]e perceive no reason to revisit our conclusion that we should consider the prevailing understanding of the right to bear arms in both 1868 and 1791").

Other courts agree with the Second Circuit. *E.g.*, *Hanson v. D.C.,* 120 F.4th 223, 238 n.7 (D.C. Cir. 2024) (describing three reasons "to believe that analogues

---

[4] In *Bruen*, the Supreme Court acknowledged, but declined to resolve, an ongoing scholarly debate "on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope…" 597 U.S. at 37–38 (citing, for example, K. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022) ("When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings")). This debate remains ongoing— recent scholarship has argued for the importance of a wider historical lens. *See, e.g.*, Jacob D. Charles, *The Dead Hand of a Silent Past: Bruen, Gun Rights, and the Shackles of History*, 73 Duke L.J. 67 (2023).

after 1791 are still relevant"), *cert. denied*, 145 S. Ct. 2778 (2025); *Ocean State Tactical, LLC v. Rhode Island,* 95 F.4th 38, 51–52 (1st Cir. 2024) (rejecting argument that laws from 1830s and onwards "provide no insight" into the historical tradition of firearms regulations), *cert. denied*, 145 S. Ct. 2771 (2025); *Kipke v. Moore,* 165 F.4th 194, 207 (4th Cir. 2026) ("[T]he sources we look to at *Bruen* step two can come throughout American history").

This position must be correct. The Reconstruction Amendments represent "a Second Founding" for America. *See* Eric Foner, THE SECOND FOUNDING: HOW THE CIVIL WAR AND RECONSTRUCTION REMADE THE CONSTITUTION (2019). To properly understand this critical change to the Constitution, judges must look at the available sources that tell them what that change was meant to encompass. To refuse to do this is to deny the force of the constitutional amendment itself.

For challenges to state handgun laws like this one, Reconstruction-era sources are among the most relevant historical evidence available.

This Court's recent decision in *Lara v. Commissioner*, 125 F.4th 428 (3d Cir. 2025), confirms that conclusion. *Lara* reaffirms that historical evidence beyond the Founding era remains a "critical tool of constitutional interpretation," *id.* at 441 (quoting *Bruen*, 597 U.S. at 35), that courts must evaluate modern regulations by identifying the "principles underlying the Second Amendment," *id.* (quoting *Rahimi*, 602 U.S. at 692), and that laws "through the end of the 19th century" may properly

16

illuminate and confirm Founding-era meaning. *Id.* (quoting *Bruen*, 597 U.S. at 35). The operative distinction, this Court held, is not between Founding and post-Founding sources. *Id.* It is between later evidence that *contradicts* Founding-era evidence and later evidence that *confirms* Founding-era evidence. Post-ratification sources are impermissible only where they try to "overcome or alter" the original meaning of the Second Amendment. *Id.* (quoting *Bruen*, 597 U.S. at 36). Where post-ratification sources instead "confirm a court's understanding of Founding-era public meaning," they are properly considered. *Id.* (citing *Bruen*, 597 U.S. at 37). *Lara* applied that principle to reject Reconstruction-era sources because it found that they conflicted with Founding-era evidence. But *Lara* also named its own limit: where no such conflict exists, later sources can be considered. 125 F.4th at 441.

Nor does *Lara* suggest that only Founding-era regulations are relevant or that modern laws must mirror eighteenth-century practices. To the contrary, it reiterates *Rahimi*'s instruction that the constitutional inquiry centers on historical principles, not the existence of identical regulatory forms. *Lara*, 125 F.4th at 441 (citing *Rahimi*, 602 U.S. at 692). Those principles include the government's longstanding authority to impose objective conditions on firearm acquisition to protect public safety—authority reflected both in early American law and in the widespread adoption of licensing statutes in the nineteenth century.

### 1. General Permitting Regime

Under *Bruen*, the relevant inquiry is whether the State's law is analogous to historical regulations in "how and why" it burdens "a law-abiding citizen's right to armed self-defense." 597 U.S. at 29. Delaware's permit-to-purchase statute is "relevantly similar" to historical laws of the same ilk. *See id.*

Delaware requires an individual to obtain a qualified purchaser permit before buying a handgun. 11 Del. C. § 1448D(b)(1). The applicant must submit identifying information in a prescribed application, *id.* § 1448D(d)(1), undergo fingerprinting, and pass state and federal background checks, *id.* § 1448D(h)(1). The State Bureau of Investigation must issue the permit within thirty days unless the applicant is disqualified under objective statutory criteria. *Id.* § 1448D(b), (h). This "shall-issue" framework conditions firearm acquisition on a determination that the applicant is a law-abiding and responsible citizen—precisely the type of "condition[] and qualification[] on the commercial sale of arms" the Court recognized as presumptively lawful. *Heller*, 554 U.S. at 626–27; *Bruen*, 597 U.S. at 38 n.9; *see also supra* Part II.A.

That structure is not new. Historical evidence shows that licensing schemes requiring advance government approval before acquiring, possessing, or carrying firearms were widespread by the nineteenth century and reflect a deeply rooted regulatory tradition. *See* Saul Cornell, *The Right to Regulate Arms in the Era of the*

18

*Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. Davis L. Rev. Online 65, 84, 89 (2021) (permitting schemes became "the dominant model of firearms regulation" and were widely adopted by both municipalities and states). Indeed, by the end of the nineteenth century, residents in the Nation's ten largest cities "all lived under some form of restrictive public carry regime," including permit systems requiring government approval. *Id.* at 84.

Early licensing laws and municipal ordinances confirm the same principle. In 1806, Virginia required certain individuals to obtain a license before keeping or carrying firearms or ammunition. Act of Feb. 4, 1806, ch. XCIV, 1805–1806 Va. Acts 51. Municipal ordinances imposed comparable requirements. New York City required individuals wanting to carry pistols to apply to local police, which would issue permits only upon satisfaction that the applicant was "a proper and law-abiding person." N.Y.C., N.Y., Ordinances ch. 8, art. 27, § 265 (1881). Jersey City required concealed-carry applicants to prove that they were "temperate," capable of self-control, and to obtain endorsements attesting to their fitness. Jersey City, N.J., Ordinance to Re-organize the Local Government of Jersey City § 3 (1874).

These laws are analogous to Delaware's permitting regime. Each required firearms—or transactions involving them—to pass through a system of prior government authorization designed to ensure that only qualified individuals could

obtain access. The fact that some historical laws regulated sellers while Delaware regulates purchasers does not undermine the analogy. The operative mechanisms are identical. Firearms may be transferred only after the government confirms that statutory conditions are satisfied. That is precisely the type of regulatory framework *Heller* and *Bruen* recognized as consistent with the Second Amendment. 554 U.S. at 626–27; 597 U.S. at 38 n.9.

The other requirements imposed by Delaware's law are likewise comparable to historical practice. Delaware requires applicants to submit an application, undergo review, and await approval before buying a handgun. 11 Del. C. § 1448D(b), (d), (h). Historical licensing systems imposed the same kinds of requirements— application, demonstration of eligibility or character, and a period of administrative review before lawful acquisition or possession could occur. *See, e.g.*, 1893 Fla. Laws 71–72; N.Y.C. Ordinances § 265 (1881). These systems entailed administrative costs and small delays inherent in government review. Delaware's law imposes no greater burden. It simply reflects the ordinary operation of a regulated market for handguns.

Finally, the purposes underlying Delaware's law mirror those of its historical predecessors. Delaware conditions handgun acquisition on a determination that the applicant is not disqualified and does not pose a danger, relying on background checks and statutory criteria to ensure that only law-abiding, responsible individuals

purchase handguns. 11 Del. C. § 1448D(f), (h). Historical laws pursued the same goal through licensing standards requiring "proper and legitimate use" or demonstrated responsibility. *See* 1893 Fla. Laws 71–72; Jersey City Ordinance § 3 (1874). This shared purpose—the "why" of the regulation—confirms the validity of the analogy. *Bruen*, 597 U.S. at 29; *Rahimi*, 602 U.S. at 692.

Delaware's permitting requirement is a modern implementation of a longstanding regulatory tradition: conditioning purchase of handguns on a prior determination that the applicant is a law-abiding and responsible citizen. Because that tradition is well-established in the historical record, Delaware's statute is constitutional under the Second Amendment.

### 2. Training

Delaware's requirement that handgun purchasers complete a firearms-training course, including instruction in safe handling and live-fire operation, similarly falls comfortably within the Nation's historical tradition of firearm regulation. *See* 11 Del. C. § 1448D(f)(4). Justice Kavanaugh recognized "objective shall-issue licensing regimes" that incorporate "training in firearms handling and in laws regarding the use of force" as constitutional. *Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring). From the Founding era onwards, American law reflected the principle that the right to keep and bear arms presupposed responsible, trained, and disciplined

use of firearms. Delaware's modest training requirement embodies that principle through modern means.

Delaware's law provides that a handgun purchaser permit may not be issued unless the applicant has completed, within the preceding five years, a firearms-training course sponsored by law-enforcement agencies, colleges, nationally recognized organizations that customarily offer firearms training, or firearms training schools with instructors certified by a nationally recognized organization that customarily offers firearms training. 11 Del. C. § 1448D(f)(4). The requirement is objective: any applicant who completes a qualifying course and satisfies the statutory criteria is entitled to a permit. *See id.* §§ 1448D(b), (f)(4). Delaware's training requirement is constitutionally permissible.

The historical pedigree of such training requirements is substantial. At the Founding, the right to keep and bear arms was understood to be directly connected to the concept of a "well-regulated militia"—a phrase that contemporaries understood to imply training, discipline, and proficiency in arms. The Virginia Declaration of Rights defined a "well-regulated militia" as "composed of the body of the people, *trained to arms*." Va. Decl. of Rights § 13 (1776) (emphasis added). During the ratification debates, the Virginia Convention proposed amendments to the U.S. Constitution describing the militia as "the body of the people trained to arms." 37 *Documentary History of the Ratification of the Constitution* 253 (John P.

Kaminski et al. eds., 2020). These statements are evidence of the Founding generation's understanding that an armed citizenry necessarily entailed firearms training and competence.

That understanding was not merely academic. Governments imposed affirmative legal obligations requiring citizens to train with firearms. English subjects were required to attend "mandatory practice sessions, for the King insisted that the people be expert in the use of the arms they were obliged to possess." Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 5–6 (1994). Colonial and early American militia laws likewise required citizens to appear armed for musters, inspections, and drills designed to ensure operational familiarity with firearms.

Most prominently, the Militia Act of 1792 required most enrolled citizens to equip themselves with firearms and directed commanding officers to "cause the militia to be exercised and trained." Act of May 8, 1792, ch. 33, § 7, 1 Stat. 271, 273. States imposed similar obligations. New York laws from 1780 and 1782 required citizens to participate in military exercises involving firearms training. An Act for Regulating the Militia of the State of New York (1780), 1779 N.Y. Laws, ch. 55; An Act to Regulate the Militia (1782), 1781 N.Y. Laws, ch. 27. Tennessee required militia members to attend musters "for the purpose of being trained . . . at regimental drills." 1821 Tenn. Pub. Acts 63, ch. 55, § 2. Vermont similarly mandated

23

regular training exercises. 1837 Vt. Acts & Resolves 38, ch. 10, § 2. Governments required armed citizens to undergo firearms training to ensure discipline, competence, and public safety. Delaware's law serves the same goals.

The burdens imposed by Delaware's law are modest by historical standards. Founding-era militia laws often required attendance at drills and musters under penalty of law. *See* Act of May 8, 1792, ch. 33, § 7, 1 Stat. at 273; 1821 Tenn. Pub. Acts 63, ch. 55, § 2. Delaware's law, in contrast, requires completion of a qualifying course once every five years before obtaining a handgun purchaser permit.

The rationale underlying the historical laws mirrors Delaware's goals. Training requirements existed to ensure that armed citizens could safely and effectively use firearms without endangering themselves or the public. President Washington captured this principle in his first annual address to Congress, observing that "a free people ought *not only to be armed, but disciplined*." 1 *Journal of the Second Session of the Senate of the United States of America*, Jan. 4, 1790 (1820) (emphasis added). Delaware's law serves the same purpose by ensuring that those who buy handguns have basic competence in safely handling firearms and are trained in how to appropriately use their handguns for lawful self-defense—the core purpose of the Second Amendment. *See Heller*, 554 U.S. at 599; *McDonald*, 561 U.S. at 767.

Under *Bruen* and *Rahimi*, that is sufficient. The governing principle here is unmistakable and deeply rooted in American history: the right to keep and bear arms has long coexisted with laws ensuring that those who have firearms are trained in safe and responsible firearm use. *See Rahimi*, 602 U.S. at 692 (courts must identify principles underlying historical analogues).

### 3. Dangerousness

Delaware's statute requires that an individual found to pose a danger to themselves or to others be denied a permit to purchase a handgun. The Director may not issue a permit when there is probable cause to believe the applicant "poses a danger of causing physical injury to self or others by owning, purchasing, or possessing firearms." 11 Del. C. § 1448D(f)(3). That provision reflects a constitutional principle repeatedly recognized by the Supreme Court, this Court, and courts across the country: the Second Amendment allows disarming individuals who pose a demonstrated threat of violence.

The Supreme Court has examined the relevant history, and in doing so, its decisions leave little doubt about this principle. *Bruen* repeatedly described the Second Amendment as protecting the rights of "law-abiding, responsible citizens." 597 U.S. at 9, 15, 26, 29, 31, 38. The Court also reaffirmed *Heller*'s recognition that "longstanding prohibitions" on persons considered to pose a risk of firearms misuse are presumptively lawful. *Heller*, 554 U.S. at 626–27 & n.26; *Bruen*, 597 U.S. at 38

n.9. The Court made this explicit in *Rahimi* when it held that the government may disarm individuals who have been found "by a court to pose a credible threat to the physical safety of others." 602 U.S. at 702. Surveying historical surety and going-armed laws, the Court explained that "[s]ince the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms." *Id.* at 690. The Court distilled the governing constitutional rule in unmistakable terms: "When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 698.

The reasoning in *Range* reinforces the same point through a contrast. There, the Court held that the government did not show a historical tradition supporting the disarmament of a *nonviolent* individual convicted decades earlier of food-stamp fraud. 124 F.4th at 229–32. In doing so, the Court distinguished laws targeting "dangerous" individuals and expressly recognized *Rahimi*'s holding that people who pose a threat of violence may constitutionally be disarmed. *Id.* at 229–30. The majority explained that *Rahimi* approved disarmament because the government had shown a historical tradition of disarming persons who "pose[] a clear threat of physical violence to another." *Id.* at 230 (quoting *Rahimi*, 602 U.S. at 698). The government could not prevail against Range because there was "no evidence that he pose[d] a physical danger to others." *Id.*

The various opinions in *Range* recognized the same constitutional principle. Judge Matey explained that historical tradition allows disarmament where individuals "threaten[] the life or safety of another" or otherwise endanger the "common good." *Range*, 124 F.4th at 238–41 (Matey, J., concurring). Judge Krause reiterated that historical tradition supports disarming categories of persons "thought by a legislature to present a special danger of misuse." *Id.* at 251–52 (Krause, J., concurring in the judgment, joined in part by Roth, J.). The dissent agreed that historical tradition allows disarming persons considered dangerous or disloyal. *Id.* at 293–94, 294 n.8 (Shwartz & Restrepo, JJ., dissenting).

Other circuits have reached the same conclusion after *Bruen* and *Rahimi*. The Tenth Circuit recognized a "historical principle that legislatures may disarm those believed to pose a risk of future danger." *United States v. Harrison*, 153 F.4th 998, 1021–22 (10th Cir. 2025) (canvassing federal appellate courts that have held individuals who pose a risk of future danger can be disarmed). The Sixth Circuit concluded that historical tradition allows disarming persons considered dangerous. *United States v. Williams*, 113 F.4th 637, 656–62 (6th Cir. 2024). The Eighth Circuit has recognized that legislatures had authority to disarm persons "who deviated from legal norms," including those considered dangerous or threatening. *United States v. Jackson*, 110 F.4th 1120, 1127 (8th Cir. 2024). Delaware's statute fits within this established, unambiguous historical tradition. Section 1448D(f)(3) authorizes denial

27

only where there is probable cause to believe the applicant "poses a danger of causing physical injury to self or others" through firearm possession. 11 Del. C. § 1448D(f)(3).

Historical sources confirm that this disarmament is constitutional. English and early American law distinguished peaceable citizens from individuals who threatened violence or public disorder. Preceding colonial statutes, the English surety system empowered justices of the peace to require security from persons who threatened others, carried arms "to the terror of the people," or otherwise posed a danger to public peace. *See* 4 William Blackstone, *Commentaries on the Laws of England* 251–56; *see also Rahimi*, 602 U.S. at 699–700 (discussing surety laws). The Statute of Northampton prohibited going armed "in affray of the peace." 2 Edw. 3, c. 3 (1328); *see also Bruen*, 597 U.S. at 45–46.

Governments have long possessed the authority to disarm individuals deemed dangerous to public peace and safety. *See* Mass. Province Laws ch. 18, § 6 (1692); Acts and Laws of His Majesty's Province of New Hampshire ch. 11, § 5 (1771). Founding-era sources likewise recognized that the right to keep and bear arms belonged to "peaceable citizens" and permitted disarmament where individuals posed a "real danger of public injury." *See The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents* (1787), reprinted in 2 *The Documentary History of the Ratification of the*

*Constitution* 618, 623–24 (Merrill Jensen et al. eds., 1976); Massachusetts Convention Journal (Feb. 6, 1788), reprinted in 6 *Documentary History of the Ratification of the Constitution* 1452, 1452 (John P. Kaminski et al. eds., 2000).

Historically, governments restricted firearm access for individuals who threatened violence or endangered public safety. Delaware's statute serves the same purpose through a modern administrative mechanism.

## CONCLUSION

This Court should affirm the district court's denial of the preliminary injunction.

Dated: May 29, 2026

DOUGLAS N. LETTER
SHIRA LAUREN FELDMAN
TESS M. FARDON
BRADY CENTER TO PREVENT GUN
  VIOLENCE
840 First Street NE, Suite 400
Washington, DC 20002
(202) 370-8100

*Of Counsel for* Amicus Curiae *Brady Center to Prevent Gun Violence*

WILLIAM T. CLARK
LEIGH ROME
GIFFORDS LAW CENTER TO PREVENT
  GUN VIOLENCE
244 Madison Ave., Suite 147
New York, NY 10016
(202) 964-5134

*Of Counsel for* Amicus Curiae
*Giffords Law Center to Prevent Gun Violence*

Respectfully submitted,

/s/ *Joseph A. Greenaway, Jr.*
JOSEPH A. GREENAWAY, JR.
PURTI PAREEK
TESS SAPERSTEIN
STEPHEN P. DRISCOLL
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000

MICHAEL MISCHKE
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000

*Counsel for* Amici Curiae

# CERTIFICATE OF BAR ADMISSION

Pursuant to Third Circuit Local Appellate Rule 28.3(d), I certify that I am a

member of the bar of the United States Court of Appeals for the Third Circuit.


Dated: May 29, 2026
/s/ *Joseph A. Greenaway, Jr.*
Joseph A. Greenaway, Jr.

Counsel for *Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that, on May 29, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Joseph A. Greenaway, Jr.*
Joseph A. Greenaway, Jr.

Counsel for *Amici Curiae*

# CERTIFICATE OF COMPLIANCE

1.     The foregoing brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7) because it contains 6,490 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office 365 in Times New Roman 14-point font.

3.     In accordance with Third Circuit Local Appellate Rule 31.1(c), the text of this brief, as electronically filed on May 29, 2026, is identical to the text of the Brief to be submitted in paper copy.

4.     In accordance with Third Circuit Local Appellate Rule 31.1(c), this brief, as electronically filed on May 29, 2026, was scanned with a virus detection program, namely Microsoft Defender (Version 1.399.35.0), and no virus was detected.

Dated: May 29, 2026               /s/ *Joseph A. Greenaway, Jr.*
                                  Joseph A. Greenaway, Jr.

                                  Counsel for *Amici Curiae*