UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 25-3250

| | |
|---|---|
| DELAWARE STATE SPORTSMEN'S ASSOCIATION, INC., et al., *Plaintiff-Appellants,* <br><br> v. <br><br> DELAWARE DEPARTMENT OF SAFETY AND HOMELAND SECURITY, et al., *Defendants-Appellees,* | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE No. 1:25-cv-01341-MN |

**BRIEF OF AMICI CURIAE NEW JERSEY, THE DISTRICT OF COLUMBIA, CALIFORNIA, COLORADO, CONNECTICUT, HAWAI'I, ILLINOIS, MASSACHUSETTS, MINNESOTA, NEVADA, NEW YORK, OREGON, RHODE ISLAND, VERMONT, VIRGINIA, AND WASHINGTON IN SUPPORT OF DEFENDANTS-APPELLEES**

BRIAN L. SCHWALB
*Attorney General, District of Columbia*

CAROLINE S. VAN ZILE
*Solicitor General*

ASHWIN P. PHATAK
*Principal Deputy Solicitor General*

PERRY R. CAO
*Assistant Attorney General*

400 6th Street, NW, Suite 8100
Washington, D.C. 20001

JENNIFER DAVENPORT
*Attorney General of New Jersey*

JEREMY M. FEIGENBAUM
*Solicitor General*

STEPHEN EHRLICH
*Deputy Solicitor General*

JAKE MAZEITIS
*Deputy Attorney General*

25 Market Street, P.O. Box 112
Trenton, New Jersey 08625-0112

# TABLE OF CONTENTS

INTRODUCTION AND STATEMENT OF INTEREST ......................... 1

ARGUMENT ..................................................................................... 3

  I.  Shall-Issue Licensing Laws Are Facially Consistent With The Second Amendment. ................................................................... 3

      A. Shall-Issue Licensing Laws, Including This Law, Are Generally Constitutional At *Bruen*'s First Step. ...................................... 3

      B. The Historical Evidence Compels The Same Result. ............... 13

  II.  A Contrary Result Would Undermine Federalism And Public Safety.................................................................................... 19

CONCLUSION ................................................................................. 22

CERTIFICATION OF BAR MEMBERSHIP ....................................... 24

CERTIFICATION OF COMPLIANCE ............................................... 25

CERTIFICATION OF SERVICE ........................................................ 26

# TABLE OF AUTHORITIES

**Cases**

*Beckwith v. Frey,*
171 F.4th 560 (1st Cir. 2026) ..................................................................8

*Binderup v. Attorney General,*
836 F.3d 336 (3d Cir. 2016) (en banc) ...................................................15

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ........................................................................... 1, 14

*Florida v. JL,*
529 U.S. 266 (2000) ................................................................................1

*Folajtar v. Attorney General,*
980 F.3d 897 (3d Cir. 2020) ...................................................................14

*Free Speech Coal., Inc. v. Paxton,*
606 U.S. 461 (2025) ................................................................................9

*Gonzales v. Oregon,*
546 U.S. 243 (2006) ................................................................................1

*Heffner v. Murphy,*
745 F.3d 56 (3d Cir. 2014) ..................................................................3, 18

*Maryland Shall Issue, Inc. v. Hogan,*
No. 16-3311, 2021 WL 3172273 (D. Md. July 27, 2021) ........................21

*Maryland Shall Issue, Inc. v. Moore,*
116 F.4th 211 (4th Cir. 2024) (en banc) ......................................... passim

*McDonald v. City of Chicago,*
561 U.S. 742 (2010) ................................................................................1

*McRorey v. Garland,*
99 F.4th 831 (5th Cir. 2024) ............................................................. 7, 8, 12

*New Jersey Staffing All. v. Fais,*
110 F.4th 201 (3d Cir. 2024) ................................................................. 19

*NYSRPA v. Bruen,*
597 U.S. 1 (2022) ........................................................................... passim

*Oyebanji v. Gonzales,*
418 F.3d 260 (3d Cir. 2005) ..................................................................... 7

*Parker v. Montgomery Cnty. Corr. Facility/Bus. Off. Manager,*
870 F.3d 144 (3d Cir. 2017) ................................................................... 20

*Rocky Mountain Gun Owners v. Polis,*
121 F.4th 96 (10th Cir. 2024) ................................................................ 4, 8

*United States v. Clay,*
128 F.4th 163 (3d Cir. 2025) ................................................................. 19

*United States v. Dorsey,*
105 F.4th 526 (3d Cir. 2024) ................................................................... 3

*United States v. Harris,*
144 F.4th 154 (3d Cir. 2025) ................................................................. 16

*United States v. Morrison,*
529 U.S. 598 (2000) ........................................................................... 19

*United States v. Rahimi,*
602 U.S. 680 (2024) ....................................................................... passim

*United States v. Scheidt,*
103 F.4th 1281 (7th Cir. 2024) ................................................................ 4

*United States v. Vlha,*
142 F.4th 1194 (9th Cir. 2025) ................................................................ 8

**Statutes**

11 Del. C. § 1448D ............................................................. passim

18 Pa. Cons. Stat. Ann. § 6109(e)(1) .............................................2, 20

430 Ill. Comp. Stat. § 66/10 ....................................................2

Ala. Code § 13A–11–75 .........................................................2

Alaska Stat. § 18.65.700 .......................................................2, 9

Ariz. Rev. Stat. § 13–3112 .....................................................2, 10

Ark. Code Ann. § 5–73–309 ...................................................2, 9

Cal. Penal Code § 26150 .......................................................2

Colo. Rev. Stat. § 18–12–203(1) .............................................2, 10

Conn. Gen. Stat. § 29–28(a) ...................................................2

D.C. Code § 22–4506 ..........................................................2

Fla. Stat. § 790.06(2) ..........................................................2

Ga. Code Ann. § 16–11–129 ..................................................2

Haw. Rev. Stat. § 134-2 ........................................................2

Idaho Code Ann. § 18–3302(1) ...............................................2

Ind. Code § 35–47–2–3 .........................................................2

Iowa Code § 724.7(1) ...........................................................2

Kan. Stat. Ann. § 75–7c03 ....................................................2, 9

Ky. Rev. Stat. Ann. § 237.110(4) ...........................................2

La. Rev. Stat. Ann. § 40:1379.3(A)(1) .....................................2

Mass. Gen. Laws c. 140, § 121F, 131 ......................................2

Md. Code Ann., Public Safety, § 5-117.1 ...................................2

Me. Rev. Stat. tit. 25, § 2003(1) ...............................................2

Mich. Comp. Laws § 28.425b(7) ......................................2, 10

Minn. Stat. § 624.714(2)(b)........................................................2

Miss. Code Ann. § 45–9–101(6)(c) ..........................................2, 9

Mo. Rev. Stat. § 571.101(1) ...................................................2, 10

Mont. Code Ann. § 45–8–321(1) ...............................................2

N.C. Gen. Stat. § 14–415.12 ......................................................2

N.D. Cent. Code §§ 62.1–04–03(1) ......................................2, 10

N.H. Rev. Stat. Ann. § 159:6(I)(a) ...........................................2

N.J. Stat. Ann. § 2C:58-4 .....................................................2, 20

N.M. Stat. Ann. § 29–19–4(A) ..................................................2

N.Y. Penal Law § 400.01 ...........................................................2

Neb. Rev. Stat. § 69–2430(3)(b), 2433......................................2

Nev. Rev. Stat. § 202.3657(3) ...................................................2

Ohio Rev. Code Ann. § 2923.125(D) .........................................2

Okla. Stat. tit. 21, § 1290.12(12) ..............................................2

Or. Rev. Stat. § 166.291 ............................................................2

R.I. Gen. Laws § 11-47-11 .........................................................2

S.C. Code Ann. § 23–31–215(A)–(C) .....................................2, 9

S.D. Codified Laws § 23–7–7......................................................2

Tenn. Code Ann. § 39–17–1351..................................................2

Tex. Gov't Code Ann. § 411.172 ........................................................2

Utah Code Ann. § 53–5a–303.............................................................2

Va. Code Ann. § 18.2–308.04(C)........................................................2

W. Va. Code § 61–7–4.....................................................................2, 9

Wash. Rev. Code § 9.41.070 ..............................................................2

Wis. Stat. § 175.60..............................................................................2

Wyo. Stat. Ann. § 6–8–104(b)........................................................2, 10

**Other Authorities**

Michael Siegel, *Universal Background Checks, Permit Requirements, and Firearm Homicide Rates*, 7 J. AM. MEDICINE NETWORK OPEN 1 (2024) https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2821813.................................................................20

Mitchell L. Doucette et al., *Deregulation of public civilian gun carrying and violent crimes: A longitudinal analysis 1981-2019*, 23 CRIM. & PUB. POL'Y 833 (2024) ........................................................20

<u>**INTRODUCTION AND STATEMENT OF INTEREST**</u>

The Constitution affords *Amici*—New Jersey, the District of Columbia, California, Colorado, Connecticut, Hawai'i, Illinois, Massachusetts, Minnesota, Nevada, New York, Oregon, Rhode Island, Vermont, Virginia, and Washington—"great latitude" in enacting policies which protect "the lives, limbs, [and] health" of their residents. *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (quotation omitted). Given the "extraordinary dangers" firearms can pose, *Florida v. JL*, 529 U.S. 266, 272 (2000), States have long used their broad police powers to ensure that only "law-abiding, responsible citizens" may obtain certain firearms, *NYSRPA v. Bruen*, 597 U.S. 1, 38 n.9 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)). Though no two States' firearm regulations are identical, *Amici* share an interest in ensuring the Second Amendment affords flexibility, consistent with our Nation's historical traditions, to protect citizens from violence. *See McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (recognizing state and local governments' "ability to devise solutions to social problems that suit local needs and values" and that their "experimentation with reasonable firearms regulations will continue under the Second Amendment").

*Amici* thus submit this brief pursuant to Fed. R. App. P. 29(a)(2) to explain why Delaware's shall-issue licensing regime ("Permit Law")—which, like other shall-issue permitting schemes, merely requires potential gun owners to be a certain age, undergo safety training, and pass a

background check to obtain a firearm—is consistent with the Second Amendment. Granted, this Court may dismiss on the claim-splitting issue or due to the preliminary nature of the proceeding. *See* Del. Br. 18-20. But if this Court does reach the merits, it should reject the challengers' interpretation, which would raise questions about the constitutionality of shall-issue permitting regimes across the country, including in both Pennsylvania and New Jersey.[1] Rather, this Court should conclude

---

[1] *See, e.g.*, Ala. Code § 13A–11–75; Alaska Stat. § 18.65.700; Ark. Code Ann. § 5–73–309; Ariz. Rev. Stat. § 13–3112; Cal. Penal Code § 26150; Colo. Rev. Stat. § 18–12–203(1); Conn. Gen. Stat. § 29–28(a); 11 Del. C. § 1448D; D.C. Code § 22–4506; Fla. Stat. § 790.06(2); Ga. Code Ann. § 16–11–129; Haw. Rev. Stat. § 134-2; Idaho Code Ann. § 18–3302(1); 430 Ill. Comp. Stat. § 66/10; Ind. Code § 35–47–2–3; Iowa Code § 724.7(1); Kan. Stat. Ann. § 75–7c03; Ky. Rev. Stat. Ann. § 237.110(4); La. Rev. Stat. Ann. § 40:1379.3(A)(1); Me. Rev. Stat. tit. 25, § 2003(1); Md. Code Ann., Public Safety, § 5-117.1; Mass. Gen. Laws c. 140, § 121F, 131; Mich. Comp. Laws § 28.425b(7); Minn. Stat. § 624.714(2)(b); Miss. Code Ann. § 45–9–101(6)(c); Mo. Rev. Stat. § 571.101(1); Mont. Code Ann. § 45–8–321(1); Neb. Rev. Stat. § 69–2430(3)(b), 2433; Nev. Rev. Stat. § 202.3657(3); N.H. Rev. Stat. Ann. § 159:6(I)(a); N.J. Stat. Ann. § 2C:58-4; N.M. Stat. Ann. § 29–19–4(A); N.Y. Penal Law § 400.01; N.C. Gen. Stat. § 14–415.12; N.D. Cent. Code §§ 62.1–04–03(1); Ohio Rev. Code Ann. § 2923.125(D); Okla. Stat. tit. 21, § 1290.12(12); Or. Rev. Stat. § 166.291; 18 Pa. Cons. Stat. Ann. § 6109(e)(1); R.I. Gen. Laws § 11-47-11; S.C. Code Ann. § 23–31–215(A)–(C); S.D. Codified Laws § 23–7–7; Tenn. Code Ann. § 39–17–1351; Tex. Gov't Code Ann. § 411.172; Utah Code Ann. § 53–5a–303; Va. Code Ann. § 18.2–308.04(C); Wash. Rev. Code § 9.41.070; W. Va. Code § 61–7–4; Wis. Stat. § 175.60; Wyo. Stat. Ann. § 6–8–104(b). Vermont is the exception, and "has no permitting system" for purchasing or carrying handguns on the books. *Bruen*, 597 U.S. at 13 n.1. Notably, "some 'shall-issue' jurisdictions have so-called 'constitutional carry' protections that allow certain individuals to carry handguns in

that shall-issue regimes are lawful under either or both of *Bruen*'s two steps—just as every other circuit to consider the question has done.

<u>**ARGUMENT**</u>

**I. Shall-Issue Licensing Laws Are Facially Consistent With The Second Amendment.**

The challengers' claims fail as a matter of both precedent and first principles. A claim of facial unconstitutionality is "the most difficult challenge to mount successfully." *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (citation omitted). To succeed, Plaintiffs must prove "that there is no set of circumstances under which the [challenged] scheme may be applied constitutionally." *Heffner v. Murphy*, 745 F.3d 56, 70 (3d Cir. 2014) (cleaned up). Conversely, to prevail, Delaware "need only demonstrate that [the Permit Law] is constitutional in some of its applications." *Rahimi*, 602 U.S. at 693. The challengers' claims fail under either or both steps of the *Bruen* test.

**A. Shall-Issue Licensing Laws, Including This Law, Are Generally Constitutional At *Bruen*'s First Step.**

At step one, a court ascertains "whether the Second Amendment's plain text covers an individual's conduct." *United States v. Dorsey*, 105 F.4th 526, 531 (3d Cir. 2024) (cleaned up). "Among other plain-text requirements," a law "falls within the ambit of the Second Amendment only if the regulation 'infringes' the Second Amendment right to keep and bear

---

public within the State without *any* permit." *Id.* But those States still also operate shall-issue permitting regimes for certain circumstances.

arms." *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 220 (4th Cir. 2024) (en banc) ("*MSI*"); *see also, e.g.*, *United States v. Scheidt*, 103 F.4th 1281, 1284 (7th Cir. 2024) (dismissing a challenge where plaintiff failed to show challenged law infringed Second Amendment right). If the law does not infringe the right or otherwise lies outside the Second Amendment's plain text, "the inquiry ends" and "the government may regulate the[ conduct] without infringing upon the Second Amendment." *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 114 (10th Cir. 2024) ("*RMGO*"). Shall-issue licensing regimes, including Delaware's law, are constitutional at this first step.

### 1. Shall-Issue Licensing Regimes Do Not Facially Infringe On The Second Amendment.

Both logic and the Supreme Court's decision in *Bruen* provide the roadmap for distinguishing between non-infringing shall-issue licensing regimes and impermissible measures. In *Bruen*, the Court struck down a New York law which empowered licensing authorities to assess whether a citizen "demonstrate[d] a special need for self-defense," then a necessary prerequisite for obtaining a New York permit. 597 U.S. at 38. If, in the exercise of its discretion, the licensing authority determined that no such need existed, the individual could not obtain a license. *See id.* This scheme thereby "banned or effectively banned the possession or carry of arms" by some law-abiding citizens, thus infringing the right in a similar way to firearm bans in *Heller* and *Rahimi. MSI*, 116 F.4th at 221. And

after concluding that there was no historical basis for these so-called "may-issue" regimes, the Court held that they were unconstitutional. *See Bruen*, 597 U.S. at 70-71.

But the Court contrasted "may-issue" regimes, like the one in New York, with "shall-issue" regimes, which are found in "the vast majority of States." *Id.* at 13. While may-issue laws had a "proper cause" requirement that gave the licensing authority unchecked discretion to deny a license *despite* "satisf[ying] statutory criteria," *id.* at 14–15, shall-issue schemes require those same authorities to "issue concealed-carry licenses whenever applicants satisfy" "narrow, objective, and definite standards," *id* at 13, 38 n.9 (citation omitted), like passing a background check or attending a firearms safety training course. Among permissible standards are those that deny licenses to "individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon." *Id.* at 13 n.1. Thus, the Court distinguished shall-issue regimes from may-issue laws and listed the shall-issue regimes that the *Bruen* decision did not call into question.

Logic makes clear the importance of that distinction: shall-issue regimes, unlike may-issue laws, do not inherently infringe Second Amendment rights. May-issue regimes generally infringe the right of "law-abiding citizens with ordinary self-defense needs" to carry guns by requiring applicants to show "some additional special need" to carry a gun. *Bruen*, 597 U.S. at 11, 60. As a result, the special need requirement was

subject to its own constitutional scrutiny. By contrast, shall-issue regimes "do not require applicants to show an atypical need for armed self-defense" and instead "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." *Id.* at 38 n.9 (cleaned up). Put differently, shall-issue statutes provide the *mechanism* by which the State imposes its preexisting judgments as to who may possess or carry a firearm—preexisting judgments that can themselves be the subject of separate challenges. So a shall-issue regime is merely how the State assesses if the person is a felon, or has a domestic violence restraining order, or is a minor, or fits any other disqualification that bars them from possessing or carrying a firearm. Understood in that proper way, the only inconvenience any otherwise law-abiding citizen could expect from a shall-issue regime itself is paperwork and a period between application and permit issuance.

Accordingly, the shall-issue regime does not infringe the right because it is only the application-and-review process by which the State assesses each individual's compliance with statutory disabilities, permitting law-abiding citizens to have weapons but keeping them away from dangerous ones. There is no infringement on any right, just a delay in its exercise to ensure that dangerous people do not possess firearms. So shall-issue regimes "do not necessarily prevent" the "exercise[]" of the "Second Amendment right to public carry"; they merely confirm that the

individuals obtaining firearms *are* the types of "law-abiding, responsible citizens" that enjoy Second Amendment protections. 597 U.S. at 38 n.9.

*Bruen* went to some length to emphasize that its decision did not "suggest the unconstitutionality" of shall-issue regimes. *Id.* Even if considered dicta, this Court is "bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings," particularly if "a dictum is of recent vintage and not enfeebled by any subsequent statement." *Oyebanji v. Gonzales*, 418 F.3d 260, 265 (3d Cir. 2005) (Alito, J.) (cleaned up). And "it doesn't get more recent or detailed" than "footnote 9 [in *Bruen*]." *McRorey v. Garland*, 99 F.4th 831, 837 (5th Cir. 2024). Still more, two members of *Bruen*'s majority—Justice Kavanaugh, joined by the Chief Justice—specifically emphasized that "shall-issue" laws remained "constitutionally permissible" and that, "[g]oing forward," those States which employed shall-issue regimes "may continue to do so." *Id.* at 80 (Kavanaugh, J, concurring).

*Bruen* thus confirms that a facial challenge to a shall-issue regime should fail at its first step. After all, in explaining that shall-issue regimes are constitutionally permissible, neither the Court nor Justice Kavanaugh "refer[red] to any of the hallmarks of a step two historical inquiry." *MSI*, 116 F.4th at 224. Given the centrality of historical evidence to *Bruen*'s second step, the absence of any historical citations strongly implies that *Bruen*'s shall-issue discussion concerns the Second

Amendment's plain text. Indeed, fingerprinting, which Justice Kavanaugh named as an expressly permitted aspect of shall-issue regimes, *Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring), was not common "until the twentieth century," *RMGO*, 121 F.4th at 121 n.7. And this understanding of Bruen's footnote nine fits well with the first principles above: because the shall-issue regime, standing alone, merely requires submission of an application, it cannot "infringe" any particular right.

Given the strength of both the precedent and first principles, other circuits agree that shall-issue regimes generally survive at the first step. *See, e.g.*, *MSI*, 116 F.4th at 224 (4th Cir.) (en banc) (*Bruen* "grounded the 'shall-issue' discussion in step one"); *McRorey*, 99 F.4th at 837 (5th Cir.) ("*Bruen*'s footnote 9 plainly forecloses" the notion that "shall-issue" regimes are subject to the step two inquiry). In a similar vein, courts have held that laws regulating the purchase and acquisition of firearms do not infringe the Second Amendment. *See Beckwith v. Frey*, 171 F.4th 560, 568 (1st Cir. 2026) ("[L]aws regulating the purchase or acquisition of firearms do not target conduct covered by the Second Amendment's 'plain text.'"); *United States v. Vlha*, 142 F.4th 1194, 1200 (9th Cir. 2025) (rejecting a challenge to a "shall-issue" scheme because "the text of the Second Amendment [did] not cover" the regulated conduct); *RMGO*, 121 F.4th at 127 (10th Cir.) ("[Defendant] fails to prove that [the law] implicates his right to "keep and bear" arms [at] step one" because it "imposes conditions or qualifications upon the sale and purchase of arms and thus

does not fall within the protections of the plain text"). This Court should follow its sister circuits in holding that shall-issue regimes are facially outside the scope of the Second Amendment.

### 2. The Challenged Law Is A Shall-Issue Regime That Falls Outside The Second Amendment.

The Permit Law is unquestionably a shall-issue regime within the *Bruen* framework. Delaware law requires the State Bureau of Identification ("SBI") to "grant [a] handgun qualified purchaser permit within 30 days" unless "grounds exist for the denial thereof." 11 Del. C. §1448D(h). And the only listed grounds for denial in the Permit Law were either passively approved by *Bruen* or are present in other *Bruen*-approved shall-issue regimes,[2] including: (1) age,[3] (2) inability to possess a firearm under some other state or federal law (i.e. for having committed a violent crime),[4] (3) a determination, supported by evidence, that a person "poses

---

[2] *See* 597 U.S. at 13 n.1 (sanctioning the shall-issue regimes of the majority of states).

[3] *See, e.g.*, Ark. Code Ann. § 5–73–309(3)(A); Miss. Code Ann. § 45–9–101(2)(B); S.C. Code Ann. § 23–31–215(B); *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 479 (2025) (citing *Bruen*'s footnote 9 for the proposition that "the constitutionality of a reasonable, bona fide age-verification requirement" "to obtain a handgun license" is not "disputed").

[4] *See, e.g.*, Alaska Stat. § 18.65.700(a)(2); Kan. Stat. Ann. § 75–7c03(a); W. Va. Code Ann. § 61–7–4(a)(1).

a danger of causing physical injury to self or others by owning, purchasing, or possessing firearms,"[5] and (4) failure to take a firearms safety course.[6] *Id* at § 1448D(f).[7]

Nothing in this analysis changes merely because Delaware law allows for denial of a permit based on the determination, supported by evidence, that a person "poses a danger of causing physical injury to self or others by owning, purchasing, or possessing firearms." *Compare* Appellants.Br.29. Although the challengers claim this grants the State impermissible discretion, their contention ignores both the particulars of this law and *Bruen*. As to this law, the challengers ignore the express demand that any finding of dangerousness must, under the statute, be "supported

---

[5] *See, e.g.*, *Bruen*, 597 U.S. at 13 n.1 (explaining that Connecticut operates as a shall-issue jurisdiction when it had a "standard [that] precludes permits only to those individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon") (cleaned up)); Colo. Rev. Stat. § 18–12–206(b); Mo. Rev. Stat. § 571.101(2)(2)(7); N.D. Cent. Code Ann. § 62.1–04–03(1)(e).

[6] *See, e.g.*, *Bruen*, 597 U.S. at 38 n.9 (noting that shall-issue regimes permissibly required applicants to "pass a firearms safety course"); Ariz. Rev. Stat. Ann. § 13–3112(E)(6); Mich. Comp. Laws § 28.425b(1)(h); Wyo. Stat. Ann. § 6–8–104(b)(vii).

[7] The Permit Law requires applicants to be at least 21 years old. *See* 11 Del. C. §1448D(f)(1). In a case pending before the Delaware Supreme Court, a lower state court found that affording 18-to-20 year olds different firearms rights than those 21 and over was unconstitutional. *See* Op.Br.19 n.4. But, even if the Delaware Supreme Court affirms the lower court, the Permit Law would still, consistent with extant federal law, prohibit those under 18 from obtaining a handgun license in Delaware. Thus, on a facial challenge, this distinction is irrelevant.

by probable cause," 11 Del. C. §1448D(f)(3), a determination that is then subject to judicial review, *see id.* at §1448D(m). And more generally, the challengers overlook that *Bruen* further explained that "a 'suitable person'" standard [that] precludes permits only to those "individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon" is not impermissibly discretionary. *Id.* (cleaned up). Further still, several state laws affirmatively cited by *Bruen* have long maintained similar requirements. *See supra* note 5. The challengers are thus incorrect in asserting that this criterion involves standardless discretion, or that it is somehow unconstitutional.[8] Further, even if this standard were unconstitutional, that would not render the entire shall-issue regime facially unconstitutional. Delaware could still have a licensing system, just without this standard.

Still more, the Permit Law has several other features that *Bruen* already expressly approved. Aside from its first two objective standards,

---

[8] That said, while the similarity of Delaware's law to modern regimes *Bruen* blessed makes this an easy case, that is not necessary for upholding a shall-issue law. Our federalist system encourages States to "pursue local policies diverging from those of [their] neighbors." *LaSala v. Bordier et Cie*, 519 F.3d 121, 140 (3d Cir. 2008) (citation omitted). So, to the extent some future State might enact a shall-issue regime with distinct qualifications, so long as those factors still comply with the Second Amendment, "[c]ourts should presume that state officials [and legislators] are in a better position [than judges] to gauge how best to preserve public safety." *Brown v. Plata*, 563 U.S. 493, 538 (2011).

which simply restate other extant law, the Permit Law's final two qualifications are directly analogous, if not identical to, requirements that applicants "undergo a background check or pass a firearms safety course," both of which *Bruen* indicated are constitutional. *Bruen*, 597 U.S. at 38 n.9. Indeed, Justice Kavanaugh also explained that States could permit "fingerprinting" or "a mental health records check," along with "other possible requirements" to assess whether someone may be dangerous. *Id.* at 80 (Kavanaugh, J., concurring). The Permit Law is thus constitutionally indistinguishable from the shall-issue regimes approved in *Bruen*.

The Permit Law is accordingly "constitutional in [at least] some of its applications"; namely, in any case in which Delaware complies with the law as written. *Rahimi*, 602 U.S. at 693. SBI has, at most, thirty days from the filing of an otherwise compliant application to issue the permit, and nothing in the statute prevents Delaware from issuing permits prior to the thirty-day mark. *See* 11 Del. C. § 1448D(h). Further, there is no facially "abusive" delay, and "equating 'infringement' with any temporary delay … improperly discount[s] the Supreme Court's guidance that requirements such as background checks and training instruction, which necessarily occasion some delay, ordinarily will pass constitutional muster" at step one. *MSI*, 116 F.4th at 227; *see also McRorey*, 99 F.4th at 836, 840 (holding that "a period of 10 days" is not "lengthy" under *Bruen*). Burdensome fees are also not an issue here; the statute imposes no cost

for filing the application and waives any filing fee if the applicant chooses to appeal a denial. *See* 11 Del. C. §1448D(m)(1)(d).

Thus, if the challengers wish to contest the constitutionality of the law at issue, they must, as Justice Kavanaugh suggested, pursue "an as-applied challenge" arguing that the Permit Law "does not operate" in the manner in which it was designed. *Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring). But that showing is functionally impossible to make on a facial challenge. And the challengers have offered no reason to question the constitutionality of shall-issue regimes. This Court should ensure that courts do not "unduly constrain legislatures seeking to employ [shall-issue regimes] to prevent handgun misuse and violent criminal activity," and hold that the Permit Law does not facially infringe on any Second Amendment right. *MSI*, 116 F.4th at 229.

## B. The Historical Evidence Compels The Same Result.

If the Court determines that the Permit Law nonetheless implicates the text of the Second Amendment, it should still affirm at *Bruen*'s second step. At that step, courts ask if the modern regulation is "is consistent with the principles that underpin our regulatory tradition," which requires "ascertain[ing] whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 602 U.S. at 692. If so, then the law "pass[es] constitutional muster." *Id.*

13

Here, because a "handgun license requirement" is "consistent with the principles underlying our Nation's historical tradition of firearm regulation," Delaware's law survives historical scrutiny. *MSI*, 116 F.4th at 230 (Rushing, J., concurring in the judgment). "From the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others." *Rahimi*, 602 U.S. at 693. For example, during that period "[t]he act of go[ing] armed to terrify the King's subjects" was a "great offen[s]e" because it threatened the stability of the realm. *Id.* at 693-94 (quoting *Sir John Knight's Case*, 3 Mod. 117, 118, 87 Eng. Rep. 75, 76 (K. B. 1686)). Similar restrictions "authorized the King's agents to 'seize all Armes in the custody or possession of any person … judge[d] dangerous to the Peace of the Kingdome." *Id.* at 694 (quoting 14 Car. 2 c. 3, § 13 (1662)). Still more, at the Founding, "regulations targeting individuals who physically threatened others persisted" among the States and were "specifically addressed [to reduce] firearms violence." *Id.* at 694-95.

Invoking these and other laws, judges have found time and again that "the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others." *Id.* at 693; *see also Heller*, 554 U.S. at 626 (blessing "longstanding prohibitions on the possession of firearms by felons and the mentally ill"); *Folajtar v. Attorney General*, 980 F.3d 897, 913 (3d Cir. 2020) (Bibas, J., dissenting) ("In England and colonial America, the Government disarmed people who

posed a danger to others.”); *Binderup v. Attorney General*, 836 F.3d 336, 369 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgment) (“[T]he Constitution permit[s] the dispossession of persons who [have] demonstrated that they would present a danger to the public if armed.”); *MSI*, 116 F.4th at 233 (Rushing, J., concurring in the judgment) (“[H]istory demonstrates the principle that certain dangerous individuals may be prohibited from possessing firearms at all, not just from carrying them publicly.”).

Indeed, as *Rahimi* itself explained, this tradition of disarming the dangerous is well represented by two sets of historical regulations: surety laws and affray laws. *See, e.g.*, 602 U.S. at 698 (noting that these two historical regimes, taken together, reinforce the “common sense” conclusion that “[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed”). As to the former, like shall-issue laws, surety laws were a form of “preventive justice.” *Id.* at 695 (quoting 4 W. Blackstone, Commentaries on the Laws of England 251-53). The Crown could require those “suspect[ed] of future misbehavior” with a firearm to post a bond, jailing them if they refused to comply. *Id.* “In other words,” the laws operated by subjecting those “suspected of future misbehavior” to some limit on their rights up to, and including, jail. *Id.* And in addition to being “[w]ell[-]entrenched in the common law,” surety regimes were common among the colonies and States. *Id.* Founding-era Massachusetts, for example, required a

"suret[y] for keeping the peace" from anyone who went "armed offensively" and thus "misuse[d]" his firearms. *Id.* at 696. In time, "nine other jurisdictions did the same." *Id.* (citing *Bruen*, 597 U.S. at 56 and n.23).

Second, "going armed" or "affray" laws imposed penalties on those who "r[ode] or [went] armed, with dangerous or unusual weapons, [to] terrify[] the good people of the land." *Id.* at 697 (quoting 4 Blackstone 149). Such threatening displays were punished with "forfeiture of the arms" and "imprisonment." *Id.* And these restrictions endured through the Founding and beyond. Several States—including North Carolina, Alabama, and Maryland—incorporated these prohibitions into their common law, and at least four States—Massachusetts, New Hampshire, North Carolina, and Virginia—"expressly codified prohibitions on going armed." *Id.* at 697-98 (collecting citations).

Drawing on both the broad tradition and their particular applications, surety and affray laws are, at the very least, "historical cousins" with shall-issue regimes. *United States v. Harris*, 144 F.4th 154, 158 (3d Cir. 2025); *see Bruen*, 597 U.S. at 30 (holding that, while the historical laws must be "analogous," they need not be a "twin" of, nor a "dead ringer" for, the modern law). Much like the Permit Law, they operate by burdening the "public carry of firearms" by those who "threaten[] public safety" rather than those who otherwise comply with law and present no unique threat. *MSI*, 116 F.4th at 232 (Rushing, J., concurring in the judgment). The surety laws are a particularly useful comparison because they, like

16

the Permit Law, rely on the notion that those who have previously committed some dangerous action are reasonably "suspected of future misbehavior" and can face ex ante restrictions. *Rahimi*, 602 U.S. at 695.

It makes no difference that "the enforcement mechanisms of those historical laws [are] materially different" from the Permit Law. *MSI*, 116 F.4th at 235 (Rushing, J., concurring in the judgment). The Supreme Court has specifically cautioned against using such specificity in assessing historical analogues. *See id.* Just as the domestic-abuser provision challenged in *Rahimi* was "within the tradition [of] the surety and going armed laws" because it "restrict[ed] gun use to mitigate demonstrated threats of physical violence," 602 U.S. at 698, so too are shall-issue laws. Even though shall-issue regimes do not "precisely match [their] historical precursors," they are relevantly similar to surety and affray laws because "a shall-issue licensing regime [is] designed to prevent dangerous individuals from obtaining firearms." *MSI*, 116 F.4th at 235 (Rushing, J., concurring in the judgment) (citation omitted).

Unsurprisingly, other jurists agree that shall-issue laws are historically grounded. Consider a recent challenge to Maryland's shall-issue scheme, a statutory regime which the challengers in this case have described as "nearly identical" to the Permit Law. *Neuberger I*, ECF 1, ¶ 67. In that case, Judge Rushing, joined by several other judges, explained that Maryland's law was justified at *Bruen*'s second step because it was "relevantly similar" to key historical firearm regulations: the Maryland

law—like the Permit Law here—was "comparable to historical regulations restricting certain persons' ability to possess and publicly carry weapons because of the danger they posed." *MSI*, 116 F.4th at 232-33 (Rushing, J., concurring in the judgment). Expecting more specificity—that is, requiring the existence of identical shall-issue laws at the Founding to uphold these modern regulations—would inappropriately impose a "regulatory straitjacket" on the States. *Bruen*, 597 U.S. at 30.

This conclusion is reinforced by *Bruen*'s footnote nine, which, if understood as discussing *Bruen*'s step two rather than resolving the case as a dispositive matter at step one, provides "insight into the degree of fit necessary for a shall-issue licensing regime to be … consistent with the Nation's historical tradition of firearm regulation." *MSI*, 116 F.4th at 232 (Rushing, J., concurring in the judgment). That is, even assuming some full historical regulatory analysis is necessary, *Bruen*'s express approval of background checks and firearms-training courses makes clear that the modern laws fit the historical tradition—one exemplified by (but hardly limited to) surety and affray laws. *See supra* 9-12 (discussing the similarities between those regimes cited by *Bruen* and the Permit Law). Either path and either view of *Bruen* footnote nine leads to affirmance.

* * *

Facial challenges are "the most difficult challenge to mount successfully" and this case is no exception. *Rahimi*, 602 U.S. at 692; *see also Heffner*, 745 F.3d at 65. The challengers cannot identify any aspect of the

18

Permit Law that is distinguishable from shall-issue regimes sanctioned by *Bruen*, explain how merely requiring a shall-issue permit application infringes on Second Amendment rights, or seriously contest that shall-issue regimes are consistent with our history. Their challenge fails.

## II. A Contrary Result Would Undermine Federalism And Public Safety.

States are entrusted with broad authority, "within constitutional limitations," to "protect the well-being" of their residents. *New Jersey Staffing All. v. Fais*, 110 F.4th 201, 209 (3d Cir. 2024) (citation omitted). That includes the duty constitutionally "reposed in the States" to suppress "violent crime." *United States v. Clay*, 128 F.4th 163, 180 (3d Cir. 2025) (quoting *United States v. Morrison*, 529 U.S. 598, 618 (2000)). And given that firearms are inherently lethal, States have exercised their authority to protect public safety by enacting permitting regimes that ensure only responsible, law-abiding citizens can access certain weapons.

To be sure, no two schemes are identical. Each relies on different threshold criteria, appeal procedures, and timelines. *See supra* note 1. For example, some allow "certain individuals to carry handguns in public within the State without *any* permit whatsoever," while others only allow open or concealed carry with a permit. *Bruen*, 597 U.S. at 13 n.1. But the Supreme Court has tacitly approved both approaches. *Id.* at 38 n.9. And Justice Kavanaugh assured States in *Bruen* that shall-issue regimes of all stripes could "continue." *Id.* at 80 (Kavanaugh, J., concurring).

Since *Bruen*, no court has held that a shall-issue regime is facially unconstitutional. A contrary ruling here would be startling, creating a circuit split and unsettling stable law. *See Parker v. Montgomery Cnty. Corr. Facility/Bus. Off. Manager*, 870 F.3d 144, 152 (3d Cir. 2017) (declining to create a circuit split unless there is a "compelling basis" for doing so). And it could call into question the various shall-issue permitting laws across the country, imperiling the *Amici*'s historically broad authority to protect their citizens from danger. That is true especially in the Third Circuit, where each State has a shall-issue regime. *See* 11 Del. C. §1448D; N.J. Stat. Ann. §2C:58-4; 18 Pa. Cons. Stat. Ann. § 6109(e)(1). And certainly for Delaware, holding that its shall-issue regime is facially unconstitutional may well lead to a rise in lethal violence perpetrated by those who have historically been disarmed or do not understand how to safely operate a firearm. *See, e.g.*, Mitchell L. Doucette et al., *Deregulation of public civilian gun carrying and violent crimes: A longitudinal analysis 1981-2019*, 23 CRIM. & PUB. POL'Y 833, 853 (2024) (noting that permitless carry regimes increase gun violence by 32% when they replace a firearm safety training requirement); Michael Siegel, *Universal Background Checks, Permit Requirements, and Firearm Homicide Rates*, 7 J. AM. MEDICINE NETWORK OPEN 1, 5 (2024) https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2821813 ("Laws requiring a permit for the purchase of all firearms were associated with significantly lower overall homicide rates" when compared to laws simply requiring point-of-sale

background checks); *Maryland Shall Issue, Inc. v. Hogan*, No. 16-3311, 2021 WL 3172273, at \*7 (D. Md. July 27, 2021) (admitting expert testimony on "the public safety benefits of firearm safety training," which include "reducing accidental discharges, promoting responsible gun storage, reducing firearm access by criminals, and encouraging responsible gun ownership").

In the end, enjoining the Permit Law would deprive Delaware of a key aspect of its sovereignty and provide the State few options to affirmatively ensure that dangerous individuals do not have access to firearms. *Bruen*, 597 U.S. at 30. This Court would effectively be requiring firearm-safety enforcement to occur only *after* documented misuse, almost definitionally increasing fatalities and significantly decreasing the wellbeing of the citizens Delaware has an obligation to protect. The Second Amendment does not compel that result. As a matter of precedent, history, and common sense, this Court should, like *Bruen*, avoid "suggest[ing] the unconstitutionality" of laws like the Permit Law and hold that the law neither infringes on Second Amendment rights nor is inconsistent with our history of firearm regulation. 597 U.S. at 38 n.9.

## CONCLUSION

This Court should affirm the judgment of the district court.

Respectfully submitted,

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

JENNIFER DAVENPORT
*Attorney General*
*State of New Jersey*
25 Market Street
P.O. Box 112
Trenton, NJ 08625-0112

By:  */s/ Jake Mazeitis*
Jake Mazeitis
Deputy Attorney General
(609) 696-3859
jake.mazeitis@njoag.gov

ROB BONTA
*Attorney General*
*State of California*
1300 I Street
Sacramento, CA 95814

ANNE E. LOPEZ
*Attorney General*
*State of Hawai'i*
425 Queen Street
Honolulu, HI 96813

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

KWAME RAOUL
*Attorney General*
*State of Illinois*
100 West Randolph Street
Chicago, IL 60601

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. MLK Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

DAN RAYFIELD
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

JAY JONES
*Attorney General*
*Commonwealth of Virginia*
202 North Ninth Street
Richmond, VA 23219

NICHOLAS W. BROWN
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

# CERTIFICATION OF BAR MEMBERSHIP

I certify that I am a member in good standing of the bar of the U.S.

Court of Appeals for the Third Circuit.

/s/ *Jake Mazeitis*
Jake Mazeitis
Deputy Attorney General

Dated: May 29, 2026

# CERTIFICATION OF COMPLIANCE

Under Fed. R. App. P. 32(g) and L.A.R. 31.1(c), I certify that:

1.    This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) because the brief contains 5,280 words, excluding sections exempted by Fed. R. App. P. 32(f), and thus does not exceed the 6,500-word limit.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced 14-point typeface using the Microsoft Word processing system.

3.    The text of this brief complies with L.A.R. 31.1(c) because it is identical to the text of the paper copies.

4.    This brief complies with L.A.R. 31.1(c) because the electronic file was scanned with the following anti-virus software: Windows Defender and Crowdstrike Windows Sensor, version 7.2219409.0.

*/s/ Jake Mazeitis*
Jake Mazeitis
Deputy Attorney General

Dated: May 29, 2026

# <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on May 29, 2026, I caused this Amicus Brief to be filed with the Clerk of the U.S. Court of Appeals for the Third Circuit via electronic filing. Counsel of record will receive service via the Court's electronic filing system.

*/s/ Jake Mazeitis*
Jake Mazeitis
Deputy Attorney General

Dated: May 29, 2026